**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 13-60749-CIV-COHN

CARINA HAMILTON f/k/a LISA MONTI
and DAVID S. WIEDER, on behalf of themselves
and all others similarly situated;

                Plaintiffs,

v.

SUNTRUST MORTGAGE INC.; QBE
SPECIALTY INSURANCE COMPANY; and
STERLING NATIONAL INSURANCE AGENCY
n/k/a QBE FIRST INSURANCE AGENCY, INC.;

                Defendants.

_____/

**PLAINTIFFS' MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENT**
**AND CERTIFICATION OF THE SETTLEMENT CLASS**

## INTRODUCTION

The parties to this action have negotiated an extraordinary settlement that provides significant monetary relief to SunTrust Mortgage, Inc. ("SunTrust") mortgagors nationwide who had insurance coverage "force placed" on their properties, as well as prospective relief that would effectively end the lender-placed insurance ("LPI") practices at issue in this case.[1]  Under the Settlement, Defendants will pay borrowers who had LPI placed on their properties through the QBE Defendants between Apri1 1, 2008 and April 28, 2014, the date on which the parties finalized their settlement, a sum equal to 10.5% of the net premium amount that SunTrust charged them for lender-placed hazard, flood, or wind insurance, either directly or in the form of a credit to their SunTrust account.[2]  This settlement follows substantially similar LPI settlements already granted preliminary or final approval by this and other district courts, including those negotiated by the parties in *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.), *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.), *Lopez v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.), and *Casey v. Citibank, N.A.*, No. 12-cv-00820 (N.D.N.Y.).

The Settlement's benefits were the result of significant hard-fought, arms'-length negotiations by the parties and their counsel under the direction of a distinguished mediator, Jonathan Marks.  Undersigned counsel were well positioned to evaluate and negotiate this Settlement, the sixth LPI settlement in this district, because they have been investigating mortgage lenders' LPI practices since November 2010, when an article in *American Banker* first brought to light the exclusive relationships between mortgage lenders and their force-placed insurers.  Specifically, since that time, Plaintiffs' counsel have investigated the practices of more than eight major mortgage lenders, including SunTrust, and the two major insurance groups that control more than 99% of the LPI market, reviewing more than three million documents and taking more than thirty depositions.  Despite that work, Plaintiffs and the Class faced important hurdles in litigating their claims to resolution.  As such, and given the immediate and substantial benefits the Settlement will provide to the Class, there can be no question that the terms of the

---

[1] The Settlement Agreement is attached hereto as **Exhibit A** and the Preliminary Approval Order is attached thereto as Exhibit D.

[2] The "net premium excludes any prior refunds to borrowers for the LPI coverage.

proposed Settlement are "within the range of reasonableness" and should receive the Court's preliminary approval.

## FACTUAL BACKGROUND

### 1.    Defendants' Force-Placed Insurance Practices

SunTrust's standard form mortgage agreements require the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  The mortgage agreement advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage. (D.E. 96 ¶¶ 2, 24.)

Plaintiffs had insurance coverage force placed on their properties by SunTrust, and challenge SunTrust's alleged arrangement with QBE Specialty Insurance Company, Sterling National Insurance Agency n/k/a QBE FIRST Insurance Agency, Inc., (the "QBE Defendants"), and their subsidiaries or affiliates, to artificially inflate borrowers' premiums with costs well beyond the cost of coverage.  (*Id.* ¶¶ 36-49, 64-84.)  Plaintiffs allege that these costs include kickbacks to SunTrust or its affiliates, "profit sharing" payments, and other costs unrelated to the procurement of new coverage.  (*Id.* ¶¶ 25, 30, 32, 33.)  Plaintiffs allege further that Defendants charge amounts for duplicative coverage placed during periods potentially covered by Standard Mortgage Clauses or Lender's Loss Payable Endorsements, (*id.* ¶ 34), and for retroactive coverage for periods when no claims were made, (*id.* ¶ 28).

### 2.    The *Hamilton* Litigation

Carina Hamilton and David Wieder have asserted claims against SunTrust and the QBE Defendants for breach of the implied covenant of good faith and fair dealing, and against the QBE Defendants only for unjust enrichment and tortious interference with a business relationship.  (D.E. 96.)  All of these claims arose from the alleged force-placed insurance scheme described above.  (*Id.*)

Defendants moved to dismiss all claims against them in December 2013.  (D.E. 107, 108.)  Those motions were fully briefed, and the Court denied them in their entirety.  (D.E. 116, 117, 145, 147.)  The parties conducted discovery, with SunTrust and the QBE Defendants producing thousands of pages of documents for Plaintiffs' review. (Ex. A ¶ 1.4.)  On February

24, 2014, Plaintiffs moved for class certification and submitted their expert's report.  (D.E. 136 (filed under seal).)

### 3.  The *Hamilton* Mediation

On March 14, 2014, Plaintiffs, SunTrust, and the QBE Defendants participated in a formal mediation of this matter with Jonathan Marks as the mediator.  (Ex. A ¶ 1.10.)  In advance of and during the mediation, Defendants provided Plaintiffs and Class Counsel with additional information concerning SunTrust's hazard, flood, and wind LPI programs, including aggregate LPI premium information for all three programs.  (*Id.* ¶ 1.11.)  The mediation involved an in-person mediation session, conference calls, and the exchange of requested written information concerning the claims raised in litigation.  It also included the collection, production, and review of large volumes of electronically stored data concerning LPI policies.

On March 28, 2014, the parties reached a settlement in principle and executed a term sheet that identified the material terms for the Settlement Agreement.  Plaintiffs announced their settlement with the Defendants of all LPI claims nationwide on April 9, 2014.  (D.E. 151.)  The parties finalized the terms of the Settlement Agreement on April 28, 2014.  (Ex. A.)

### 4.  The Settlement Terms and Agreement

#### A.  *The Proposed Class*

The Settlement Agreement provides relief to all borrowers who had mortgage loans serviced by SunTrust and were charged a premium for lender-placed hazard, flood, or wind insurance coverage issued by the QBE Defendants or their subsidiaries or affiliates between April 1, 2008 and April 28, 2014.  (Ex. A ¶¶ 3.1, 3.2.)  This class will include (unless excluded for other identified reasons) borrowers whose homes are in foreclosure, who have negotiated a short sale,  who were granted deeds in lieu of foreclosure, or who have modified their loan terms.[3]

#### B.  *Monetary and Prospective Relief*

The Settlement Agreement affords these class members significant monetary relief, and prohibits SunTrust from engaging in certain practices alleged to inflate the insurance premium charges imposed on mortgagors for a period of six years.  (*Id.* ¶¶ 4.2-4.4.)  The monetary relief

---

[3] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded numerous categories that are included in this settlement from the class of Florida borrowers that it certified in February 2012. *See Williams*, (D.E. 211).

will compensate class members for a significant part of the allegedly inflated portion of the force-placed premiums that they either paid or were charged, either by crediting their SunTrust escrow accounts for their recovery amount, or by direct payment by check.  (*Id.* ¶¶ 4.4.2-4.4.5.) Class members who paid any portion of the amounts charged them for LPI between April 1, 2008 and the preliminary approval date will receive a check in an amount equal to 10.5% of the net premium *charged* to the class member for lender-placed hazard, flood, or wind insurance during the class period if (1) they do not have a SunTrust escrow account; (2) their escrow payments are current; or (3) SunTrust no longer services their loan and SunTrust, at its sole option, chooses not to reduce any post-judgment deficiency by the amount of the settlement payment to which it may be entitled.[4]  (*Id.* ¶ 4.4.4.)  For borrowers who paid some portion of the amounts charged them and fall into one of the three aforementioned categories, SunTrust will have the option of sending direct payment by check in an amount equal to 10.5% of the amount charged the borrower for LPI, or crediting the borrower's escrow account in the same amount. (*Id.*)  The same will hold true for borrowers who were charged for LPI, did not pay any portion of the amount charged, and still owe SunTrust for the amount charged.  (*Id.* ¶ 4.4.5.) The 10.5% payment is calculated based on the entire premium, rather than that portion that is alleged to have been inflated, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property.

The prospective relief provided by the settlement will ensure that SunTrust does not engage in the practices that are the subject of this lawsuit.[5]  The Settlement Agreement prohibits SunTrust from charging what Plaintiffs allege are inflated premiums for force-placed insurance. For a period of six years following the Final Settlement Date, SunTrust will accept no financial

---

[4]  A claims-made process is appropriate here, as SunTrust and the QBE Defendants have represented that they cannot, on a system-wide basis, determine the amount of force-placed premiums paid or currently owed by a borrower.  This has also been confirmed in other litigation against the major mortgage lenders, the QBE Defendants, and other insurers.  *See, e.g., Saccoccio*, 2014 US Dist. LEXIS 26002, at *31 (approving claims-made process and noting that "Defendants ha[d] presented evidence that they cannot, on a systemwide basis, determine which class members paid the lender-placed insurance premium or what they paid or … what portion of the lender-placed insurance premium was paid without going individually through each of the 762,390 [loan] files.").

[5]  The Settlement Agreement does not include prospective relief  regarding the QBE Defendants because the QBE Defendants no longer provide LPI coverage or services to SunTrust.  (Ex. A ¶ 4.2.5.)

interest in the placement of LPI policies other than the protection afforded it by LPI coverage. (Ex. A ¶ 4.2.1.)  The Settlement Agreement prohibits SunTrust from accepting commissions for LPI; entering into quota-share reinsurance arrangements with QBE or any other insurer; and using SunTrust affiliates to place LPI coverage.  (*Id.*)

The Settlement also binds SunTrust to establish LPI coverage at the last-known coverage amount, replacement cost value, or the unpaid principal balance on a borrower's loan, so that lender-placed coverage bears some relation to the value of the interest being protected.  (Ex. A ¶ 4.2.2.)  SunTrust will also advance funds to continue coverage under the borrower's voluntary policy in the event the policy is eligible to be renewed, SunTrust receives notice of a lapse for nonpayment of premium, and if the borrower's loan is escrowed for insurance, (*id.* ¶ 4.2.3), thus further ensuring that the cost of coverage bears some relation to the collateral's value and also reducing the number of LPI policies issued to SunTrust borrowers.  Finally, the settlement requires SunTrust to refund any amounts due the borrower once voluntary insurance is put back in place within fifteen days of receipt of evidence of the voluntary coverage.  (*Id.* ¶ 4.2.4.)

### C.  *Release of Claims against Defendants*

In exchange for the settlement relief, members of the Settlement Class will release Defendants and their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from, in sum, all claims, defenses, obligations, or damages that were or could have been sought in this litigation or that relate, concern, arise for or pertain in any way to Defendants' conduct, policies, or practices concerning LPI Policies placed or charged by SunTrust during the Class Period.  (*Id.* ¶ 10.)

### D.  *Class Notice*

Class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement as Exhibit A, assuming that form is approved by the Court.[6]  (*Id.* ¶ 6.1.)  The notice will be mailed no less than ninety days before the final approval hearing. (*Id.*)  The Settlement Administrator will establish a website on which class members can download or print a claim form and review the Settlement Agreement and its accompanying exhibits, (*id.* ¶ 6.2), and a toll-free number that class members

---

[6] In the event that a notice is returned as undeliverable, the Settlement Administrator will access the National Change of Address database and attempt to locate the class member.  (*Id.* ¶ 6.1.)

can call for information, or raise any questions or concerns. (*Id.* ¶ 7.2.1.)  In addition, the Settlement Administrator will publish notice of the settlement in the form attached as Exhibit F to the Settlement Agreement (assuming that form is approved by the Court), within seven days of the posting of the notices by mail.  (*Id.* ¶ 6.3.) Class members may opt out of the settlement by sending a request for exclusion to the Settlement Administrator.  (*Id.* ¶ 11.1.)

### E.  *Claims Process*

To obtain relief from Defendants, class members will be required to submit a claim form before a deadline set by the Court, but that will fall no later than ninety days after the final approval hearing.  (*Id.* ¶¶ 2.8, 7.1.)  The claims will be reviewed by the Settlement Administrator, who will then make the final determination of the amount owed each class member using Defendants' electronic records, and have 210 days after the Final Settlement Date to distribute the monetary relief provided for by the Settlement.  (*Id.* ¶¶ 7.3, 7.3.4, 7.3.5.)

### F.  *Class Counsel Fees and Expenses and Named Plaintiff Case Contribution Award*

In the Settlement Agreement, Defendants have agreed not to oppose the appointment of the law firms of Kozyak Tropin & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP to serve as Class Counsel for the settlement class.  (Ex. A ¶ 2.13.) Pursuant to Section 15.1 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $3,600,000.00.  (*Id.* ¶ 15.1, 15.2.)  Defendants also will not oppose an application for a Case Contribution Award to each named plaintiff not to exceed $5,000.00.  (*Id.* ¶ 15.4.)  The Court will consider whether to grant or deny these awards separate and apart from its consideration of the fairness, reasonableness, and adequacy of the settlement at the final fairness hearing.  (*Id.* ¶ 15.5.)

## **LEGAL ARGUMENT**

**I.  THE COURT SHOULD ENTER AN ORDER GRANTING PRELIMINARY APPROVAL OF THE *HAMILTON* SETTLEMENT.**

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted).   For these reasons, "[p]ublic policy strongly favors the pretrial

settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir.1992).

"Approval of a class action settlement is a two-step process." *Fresco v. Auto Data Direct, Inc.*, No. 03-cv-61063, 2007 WL 2330895, at \*4 (S.D. Fla. May 14, 2007). Preliminary approval is the first step, requiring the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id.* (citation omitted). In the second step, after notice to the class and time and opportunity for absent class members to object or otherwise be heard, the court considers whether to grant final approval of the settlement as fair and reasonable. *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 240119, at \*2 (S.D. Fla. June 15, 2010).

The standard for preliminary approval of a class action settlement is not high—a proposed settlement should be preliminarily approved if it falls "within the range of possible approval" or, otherwise stated, if there is "probable cause" to notify the class of the proposed settlement and "to hold a full-scale hearing on its fairness[.]" *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting MANUAL FOR COMPLEX LITIGATION § 1.46 at 62, 64-56 (5th ed. 1982). "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies, and the settlement falls within the range of reason." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) (citation omitted).

Here, the proposed settlement is the product of arm's-length negotiations before an experienced and respected mediator by counsel with significant experience in complex class action litigation, carries no "obvious deficiencies," and falls well within the range of reason. The Court should accordingly enter an order granting preliminary approval.

### A. The *Hamilton* Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.

At the preliminary approval stage, district courts consider whether the proposed settlement appears to be "'the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel' and not 'the result of collusion[.]'" *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (citation omitted). Courts begin by presuming good faith in the negotiating process. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with"); MANUAL FOR COMPLEX LITIGATION (THIRD) §

30.42) ("a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel").

The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arms' length.   The parties participated in formal mediation before Jonathan Marks, as well as regular communications over the course of several months, negotiating first the terms of an initial term sheet and then a settlement agreement reflecting the final terms.  Mr. Marks' significant experience mediating complex commercial suits to resolution and involvement alone weigh in favor of preliminary approval.  *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of court appointed special master to oversee mediation efforts evidenced the procedural fairness of the negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion in the negotiating process).

The parties' extensive negotiations were also informed by considerable discovery.  Class counsel has been litigating force-placed insurance claims like those presented in this action others for three years.  *See, e.g., Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373-DMM (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Popkin v. Citibank, N.A.*, No. 13-cv-60722 (S.D. Fla.); Herrick v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.); *Lopez v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of Am. N.A.*, No. 12-cv-22700 (S.D. Fla.).  More than thirty depositions have been taken or used in those cases, and more than three million documents produced and reviewed.

In this case specifically, the parties have produced thousands of pages of documents and deposed corporate and class representatives.  The parties have also engaged in motion practice, briefing motions to stay discovery, have the Court abstain from exercising jurisdiction, strike Plaintiffs' jury demand, and dismiss Plaintiffs' claims, among others.  (D.E. 29, 78, 92, 107, 108, 116, 117, 120, 121.)  Plaintiffs also filed their motion for class certification before settling with Defendants.  (D.E. 136 (filed under seal).)

The QBE Defendants also provided additional information to confirm the reasonableness of the Settlement's terms.  The fact that some of this evidence was obtained through informal

methods does not affect the ability of counsel to assess the strength and weaknesses of their respective positions. Courts have routinely approved settlements based upon information obtained by counsel through informal means. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001); *Corrugated Container Antitrust Litig.*, 643 F.2d at 211; *Cotton*, 559 F.2d at 1332.

### B. The Settlement Provides Considerable Benefits to the Class and Falls Squarely within the Range of Reasonableness.

The terms negotiated by the parties provide considerable benefits to the class, in terms of both monetary and prospective relief, and fall well within the range of possible approval.

#### 1. Monetary Relief

The Settlement Agreement provides that all class members are eligible to receive an amount equal to 10.5% of the net premium charged them for force-placed insurance in the form of either a check or a credit to their SunTrust escrow account. (Ex. A ¶ 4.4.1.)  This amount of each class member's recovery will be an amount equal to the designated percentage of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which SunTrust was entitled to protect its interest in the borrower's property—*not* of the portion of the premium alleged to be in excess of the actual or competitive cost of coverage.  (*Id.*)

Federal courts routinely hold that settlements providing the class with a percentage of the recovery sought in litigation are reasonable in light of the attendant risks of litigation.  *See, e.g., Behrens*, 118 F.R.D. at 542-43 (approving recovery of $.20 per share where desired recovery was $3.50 a share because "the fact that a proposed settlement amounts to only a fraction of the possible recovery does not mean the settlement is inadequate or unfair") (citation omitted). "Moreover, when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011).

Plaintiffs and the class faced significant hurdles in litigating their claims to resolution, including class certification and overcoming Defendants' defenses, including that SunTrust (nor any of its affiliates) did not receive any kickback or commission from the QBE Defendants related to LPI premiums or any captive reinsurance arrangement.  Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement.  The negotiated monetary recovery falls well within the range of reasonableness.

9

### 2.  Prospective Relief

Once approved, the settlement terms will also prohibit SunTrust for a period of six years from accepting a financial interest in the placement of force-placed hazard policies beyond the premium itself and the protection afforded by the policy on the properties that serve as the collateral for the loans that they extend to borrowers.  (Ex. A ¶ 4.2.1.)  This means that SunTrust will not collect, *inter alia*, LPI commissions for itself or its affiliated agents or brokers, or payments for administrative or other services associated with placement of LPI coverage.  (*Id.*)  The Settlement Agreement also requires SunTrust to establish coverage at the last-known coverage amount, replacement cost value, or unpaid principal balance, and to advance funds to maintain the voluntary policy in force in many instances.  (Ex. A ¶¶ 4.2.2, 4.2.3.)  Thus, the Settlement Agreement effectively prohibits SunTrust from implementing the practices complained of in the Complaint.  There can be no question that this result is reasonable.

### C.  The Settlement Saves the Class from Considerable Litigation Hurdles.

Any evaluation of the benefits of settlement must be tempered by the recognition that any compromise involves concessions by all settling parties.  Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Civil Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted).  Had litigation continued, Plaintiffs and class members would have faced the risk of not prevailing on their claims.  The court in *Hall v. Bank of America*, which involved claims substantially similar to those raised here, recognized at a hearing on the defendants' motions to dismiss that the defendants had "ma[de] some very good arguments" that could have ended a portion or more of the case at  summary judgment. (May 16, 2013 Hrg. Transcript at 92:21-23, attached as **Exhibit B**); *see also, e.g., Saccoccio*, 2014 WL 808653 (granting final approval of nationwide LPI settlement, noting that "there is strong authority to suggest that Plaintiff may not have prevailed" on his claims); *Kunzelmann*, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) (declining to certify nationwide class of force-placed hazard borrowers and noting obstacles created by filed-rate doctrine and application of multistate law, among other things).  The proposed settlement saves Plaintiffs and the proposed class from facing these significant obstacles, and eliminates the significant risk that they would recover nothing at all after several more years of litigation.

**D.  Counsel Believes the Settlement Is Reasonable and in the Class's Best Interest.**

Finally, significant weight should be attributed to the belief of experienced counsel that the negotiated settlement is in the best interest of the class.  *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 666 (D. Minn. 1974) (the recommendation of experienced counsel is entitled to great weight).  The firms offered as Class Counsel here have litigated numerous force-placed insurance class actions over the course of just under three years, and fully support the Settlement.  They certified the first force-placed hazard insurance class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), litigated the motion for class certification in *Kunzelmann*, No. 11-cv-81373, briefed and argued two motions to centralize force-placed insurance litigation in a nationwide MDL, procured final approval of the class action settlement in *Herrick* (n/k/a *Saccoccio*), and are currently litigating seven additional cases against other major mortgage lenders in the Southern District of Florida.  *See Fladell*, No. 13-cv-60721-FAM (preliminary approval granted); *Diaz*, No. 13-cv-21104-FAM (f/k/a *Lopez*) (preliminary approval granted); *Hall*, No. 12-cv-22700 (motion for preliminary approval pending); *Montoya v. PNC Bank, N.A.*, 14-cv-20474-JEM; *Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726-JAL; *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649-JAL (S.D. Fla.); *Jackson v. U.S. Bank, N.A.*, No. 14-cv-21252-FAM; *Circeo-Loudon v. Green Tree Servicing, LLC*, No. 14-cv-21384-MGC.  Based on this experience, and decades of experience litigating consumer class action lawsuits, it is Plaintiffs' counsel's informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.

**II.    THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS.**

"It is well established that a class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 659 (internal quotations and citation omitted; brackets in original).  "In deciding whether to provisionally certify a settlement class, a court must consider the same factors that it would consider in connection with a proposed litigation class," save manageability, "since the settlement, if approved, would obviate the need for a trial." *Id.*  (citations omitted). However, "[t]he standards of Rule 23 for class certification are more easily met in the context of settlement than in the context of contested litigation." *Horton v. Metro. Life Ins. Co.,* No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21395, at *15 (M.D. Fla. Oct. 25, 1994)  The Settlement Class satisfies Rule 23(a), as well as Rule 23(b)(3).

11

**A.  The Settlement Class Meets the Four Requirements of Rule 23(a).**

The policies underlying the class action rule dictate that Rule 23(a) should be liberally construed.  *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996).  Plaintiffs satisfy numerosity, commonality, typicality and adequacy of representation as set forth below.

**1.  The Settlement Class Is Sufficiently Numerous.**

Rule 23(a)(1) requires Plaintiffs to show that the proposed class is so numerous that joinder of all members would be impracticable.  *See* Fed. R. Civ. P. 23(a)(1).  "While there is no fixed rule, generally a class size [of] less than twenty-one is inadequate, while a class size of more than forty is adequate." *Williams v. Wells Fargo Bank, N.A.*, 11-cv-21233, 2012 WL 566067, at *4 (S.D. Fla. Feb. 21, 2012) (citing *Cheney,* 213 F.R.D. at 489-90).

The proposed number of class members in this case well exceeds the minimum threshold recognized by the Eleventh Circuit.  *See Cox,* 784 F.2d at 1553.  SunTrust placed more than 127,000 policies during the class period.  The numerosity requirement is clearly satisfied here.

**2.  There Are Questions of Law and Fact Common to All Class Members.**

 "The threshold for commonality is not high." *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484,490 (S.D. Fla. 2003) (citation omitted).  Commonality requires a showing that the class members' claims "depend on a common contention" and that the class members have "suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "[F]or purposes of Rule 23(a)(2), even a single [common] question will do[,]" *id.* at 2556 (brackets in original), and "where a common scheme of conduct has been alleged, the commonality requirement should be satisfied." *Checking Overdraft,* 2011 WL 3158998, at *4 (citation omitted).

Plaintiffs' claims here depend on the common contention that Defendants conceived and implemented a scheme to manipulate and artificially inflate force-placed insurance premiums that they would then charge to the borrower.  (D.E. 96.)  All members of the putative class were allegedly injured in the same manner:  they were charged LPI premiums that included inflated commission and other costs, and as a result have paid or now owe amounts in excess of what their mortgage agreements allowed.  (*Id.*); *see Williams,* 2012 WL 566067, at *5 (finding commonality where plaintiffs had argued that "all members of the propose class were injured in the same manner, namely by being charged inflated premiums for the force-placed insurance).

Thus, while only one question of law *or* fact is required to establish commonality, several common questions capable of class-wide resolution—or that would "generate common answers"—arise from Plaintiffs' allegations, including whether:

    a.  Defendants overcharged borrowers for force-placed insurance policies that included impermissible charges;

    b.  The premiums collected from consumers included charges to which SunTrust was not entitled under the contracts at issue; and

    c.  SunTrust breached the implied covenant of good faith and fair dealing by entering into an exclusive arrangement with the QBE Defendants to place insurance policies on mortgagors' homes with artificially inflated premiums.

No individualized inquiry will be required to answer these questions. For example, Defendants collected allegedly inflated premiums from all policies regardless of location or local practice. Resolution of this question on the merits will stand or fall on whether the scheme alleged, in fact, exists and, as a corollary, whether Defendants' uniform practice impacted all mortgagors. These common questions are capable of class-wide resolution. *Compare Checking Overdraft,* 275 F.R.D. at 673-74 (commonality requirement met based on common scheme). At this stage, the Court need only decide, based on whatever evidence is required, whether the question of Defendants' participation in a common scheme can be answered with respect to the entire class. *See Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 687 ("Where the complaint alleges that the Defendants have engaged in a standardized course of conduct that affects all class members, the commonality requirement will generally be met.").

Similarly, whether Defendants were unjustly enriched by the alleged common scheme does not involve individualized inquiry. To certify the class, the Court need not ask whether Defendants were unjustly enriched by the premiums charged to one mortgagor as opposed to another. Either Defendants took unearned profits from a force-placed scheme that was applied uniformly across the class or they did not. *See, e.g., Williams,* 2012 WL 566067, at *5 ( "The determination of the truth or falsity of the Plaintiffs' allegations that Wells Fargo and QBE engaged in a scheme to force-place insurance with inflated and excessive premiums will resolve an issue that is central to the validity of each one of the claims in one stroke.").

### 3.  Plaintiffs' Claims Are Typical of Those of the Class.

Rule 23(a)(3) requires Plaintiffs to demonstrate that their claims are typical of those held by the proposed class. *See* Fed. R. Civ. P. 23(a)(3). Typicality and commonality are related, with commonality referring to "the group characteristics of the class as a whole" and typicality

focusing on the named plaintiff's claims in relation to the class. *Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 686 n.23. "Any atypicality or conflict between the named Plaintiffs' claims and those of the class must be clear and must be such that the interests of the class are placed in significant jeopardy." *Cheney,* 213 F.R.D. at 491.

Plaintiffs' claims arise from the same alleged course of conduct and are based on the same legal theories as those brought on behalf of the proposed class.  Plaintiffs and every member of the proposed class took mortgage loans from SunTrust or its predecessors that were governed by common and materially uniform agreements.  (D.E. 96 ¶¶ 6, 24, 36, 42, 68; D.E. 29-1, 29-2, 29-3.)  Once their voluntary policies lapsed, Plaintiffs and every other member of the proposed class were charged allegedly artificially inflated force-placed insurance premiums by Defendants.  (D.E. 96 ¶¶ 27, 30, 32, 41, 70, 76, 84.)  Plaintiffs and the class seek redress through common claims for breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference.  (*Id.* ¶¶ 64-84.)  Thus, Plaintiffs' claims and those of the putative class arise from the same course of conduct and are based on the same legal theories, thereby satisfying Rule 23(a)(3).  *See, e.g., Williams,* 2012 WL 566067, at *6 (named plaintiffs were "typical of the class in that they were both charged and either paid or still owe Wells Fargo for the alleged excessive and inflated premiums for the force-placed property insurance").

### 4. Plaintiffs and Their Counsel Are Adequate Representatives.

To satisfy Rule 23(a)(4), the representative parties must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement is satisfied when the class representatives have (1) no interests antagonistic to the rest of the class and (2) counsel who are "qualified, experienced, and generally able to conduct the proposed litigation." *Cheney,* 213 F.R.D. at 495.  "Adequate representation is presumed in the absence of contrary evidence." *Association for Disabled Ams., Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 464 (S.D. Fla. 2002).

### a. Plaintiffs Do Not Have Interests Antagonistic to the Rest of the Class.

Adequacy exists where a class representative shares common interests with the class and seeks the same type of relief for himself as for other class members.  *See Tefel v. Reno,* 972 F. Supp. 608, 617 (S.D. Fla. 1997) ("Where the named plaintiffs in a class action are seeking the same type of relief for themselves as they seek for class members, the adequacy of representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure is satisfied.").

14

The named plaintiffs in this action have no interest that is antagonistic to those held by the rest of the class.  The class definition includes only individuals who were subjects of Defendants' purported force-placed hazard insurance scheme. (Ex. A ¶ 3.1.)  All members of the class, including the named plaintiffs, had insurance policies placed on their homes and were charged allegedly inflated premiums that were added to the balance of their mortgage loans or taken from escrow.  (*Id.*)  Thus, the critical issues in this case—the existence, implementation, and alleged unlawfulness of Defendants' force-placed insurance scheme—are common to Plaintiffs' claims and the claims of the class.  None of the class members benefitted from Defendants' alleged practice of overcharging for force-placed insurance; Plaintiffs allege that the class representatives and absent members would have been better served had the premiums imposed been competitive and unmanipulated by the Defendants.  As Plaintiffs prove their own claims, they will also be proving the claims of many thousands of class members.  Plaintiffs and the proposed class members share a common goal:  to recover the allegedly excessive charges that were added to their insurance premiums.  "If the Plaintiffs succeed, the benefits will inure to all class members."  *Tefel,* 972 F. Supp. at 617.  Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a)(4).  *See Williams,* 2012 WL 566067, at \*6-7.

**b. Plaintiffs' Counsel Are Qualified, Experienced, and Generally Able to Conduct the Proposed Litigation.**

The attorneys who seek to represent the plaintiff class in this case are highly qualified to serve as class counsel, have been investigating these claims for just under three years and have served as lead and co-lead counsel in some of the largest class actions in the country as well as insurance related complex cases.  There are three law firms that Plaintiffs seek to name as Class Counsel in this action – Kozyak, Tropin, & Throckmorton, P.A., Podhurst Orseck, P.A. and Harke Clasby & Bushman, LLP.  These firms have successfully prosecuted consumer class actions and their law firms are well respected in the communities that they serve, and this Court has already appointed them as Interim Class Counsel here.  "[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney."  1 NEWBERG ON CLASS ACTIONS 3d (1992) § 3.24 at 3-133 n. 353.  *See also Griffin v. Carlin*, 755 F. 2d 1516, 1533 (11th Cir. 1985) (question of adequacy of plaintiffs most often "involve[s] questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and of whether plaintiffs have interests antagonistic to those of the rest of the class").

The firms representing Plaintiffs have overseen the litigation strategy, the briefing and argument of dispositive and other motions, and the vigorous pursuit of discovery.

**B.  The Settlement Class Meets the Requirements of Rule 23(b)(3).**

In addition to meeting the four requirements of Rule 23(a), a plaintiff seeking class certification must satisfy one subsection of Rule 23(b).  *Cheney,* 213 F.R.D. at 489.  Plaintiffs here seek certification under Rule 23(b)(3). Under Rule 23(b)(3), certification is appropriate if (1) common questions of law or fact predominate over those affecting only individual class members and (2) class treatment is superior to other adjudication methods.  *See* Fed. R. Civ. P. 23(b)(3).   The latter question implicates manageability concerns, and does not bear on certification of a settlement class. *See Checking Account Overdraft Litig.*, 275 F.R.D. at 659.

For common questions of law or fact to predominate over individualized questions, "the issues in the class action that are subject to generalized proof, and [are] thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof."   *Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 694 (citation omitted). "Common questions need only predominate; they need not be dispositive of the litigation." *Id.* (citation omitted).   "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Checking Overdraft Litig.,* 2011 WL 3158998, at *7 (citation omitted).   The Eleventh Circuit has articulated the test for predominance as follows:

> [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered … If … the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Klay v. Humana, Inc.,* 382 F.3d 1241, 1255 (11th Cir. 2004).

Here, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Defendants'] scheme to" manipulate force-placed insurance premiums charged to Plaintiffs and the proposed class. *Checking Overdraft Litig.,* 2011 WL 3158998, at *7 (citation and internal quotations omitted). Defendants' alleged participation in this scheme may be substantiated by common evidence; evidence that would remain the same regardless of class size or composition.  Indeed, a finding

of liability would require *no* proof regarding individual borrowers' properties or mortgage agreements with SunTrust. Instead, Plaintiffs would be required to show, *inter alia*, that SunTrust never purchases or writes insurance for an individual borrower, but instead, purchases a group master policy from the QBE Defendants that provides continuous coverage for all loans held by SunTrust and automatically provides insurance coverage in the event any borrower/loan in the portfolio fails to provide required evidence of required insurance; and SunTrust contracted with the QBE Defendants to provide servicing activities for SunTrust's mortgage loan portfolio at below cost. Common issues would predominate over any individual issue that might arise.

Moreover, a comprehensive resolution of the class members' claims in this action would be far superior to litigating each of their claims separately, and will provide them a better chance at relief. "Since the damage amounts allegedly owed to each individual [borrower] are relatively low—especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticate defendants—the economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits." *Williams*, 280 F.R.D. at 675. Even if the class members were able to individually prosecute their claims, "[s]eparate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v, Tallant*, 710 F.2d 711, 718 (11th Cir. 1983). Accordingly, the Court should certify the proposed settlement class.

## III.    THE COURT SHOULD APPROVE THE CLASS NOTICE AND NOTICE PLAN.

Federal Rule of Civil Procedure 23(e)(1) provides that the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Class notice should be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "Not only must the substantive claims be adequately described but notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998) (internal quotations and citation omitted). The Eleventh Circuit explained:

> The standard for adequacy of a settlement notice in a class action is measured by reasonableness. *See* Fed. R. Civ. P. 23(e). We have interpreted Rule 23 to require that class members be given "information reasonably necessary to make a decision [whether] to remain a class member and be bound by the final judgment or opt out of the action," though the notice need not include "every material fact"

17

> or be "overly detailed." …. In fact, we have recognized that "an overly detailed notice: has the potential to "confuse class members and impermissibly encumber their rights to benefit from the action."

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (internal citations and footnote omitted).

The parties' proposed notice plan readily meets this standard. The Settlement Agreement provides that the Settlement Administrator shall distribute class notice by first-class mail in the form attached as Exhibit A to the Settlement Agreement and/or as ultimately approved by this Court to all identifiable members of the class no less than ninety days before the date set for a final approval hearing. (Ex. A ¶¶ 6.1 & Ex. A.) The Settlement also provides for publication notice, internet notice and establishment of a toll-free number through which class members can acquire information about the settlement, and a live-person to answer any Class Member questions or concerns. (*Id.* ¶¶ 6.2, 6.3, 7.2.1.)

The notice itself also satisfies the requirements of the Federal Rules, providing, among other things, a clear definition of the Class; a description of the underlying lawsuit and the material terms of the Settlement; instructions as to how class members may make a claim and determine whether they are eligible to do so; an explanation of class members' opt-out rights and a date by which Class members may opt out, and information regarding how to do so; instructions as to how to object to the Settlement and a date by which class members may object; the date on which the Court will hold a Final Approval Hearing; and the internet address and toll-free number from which Class members may obtain additional information about the Settlement and its terms. (Ex. A at Ex. A.) The proposed claim form also provides clear and comprehensive instructions as to who is eligible for relief and how to make a claim. (Ex. A at Ex. B.) The Court should approve the proposed Notice and Notice plan. *See, e.g., Saccoccio*, No. 13-cv-21107 (D.E. 77, 128) (approving virtually identical notice plan); *Fladell*, No. 13-cv-60721 (D.E. 168) (same).

## IV.   THE COURT SHOULD APPOINT THE UNDERSIGNED FIRMS AS CLASS COUNSEL.

The parties have named the undersigned firms as Class Counsel. (Ex. A ¶ 2.13.) The Court has already appointed Kozyak Tropin & Throckmorton, P.A. and Podhurst Orseck, P.A. as

Interim Class Counsel in this action.   (D.E. 149.)   Undersigned counsel have significant experience litigating force-placed insurance class actions, having represented plaintiffs in numerous actions against nine major mortgage lenders, the QBE Defendants, and other insurers. Counsel's investigation into these claims began more than three years ago, and since that time, counsel has acquired considerable knowledge of the practices alleged and gained experience litigating these claims.

The undersigned firms also have considerable experience litigating nationwide and multistate class actions, including *LiPuma v. American Express, et al*, Case No. 04-cv-20314 (S.D. Fla.), *In re Managed Care HMO Litigation*, MDL No. 1334 (S.D. Fla.), *In re Checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Fla.); and *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc.*, No. 10-cv-20715 (S.D. Fla.). Because undersigned counsel are highly qualified and determined to represent the best interests of the Class, the Court should appoint them Class Counsel moving forward.

<u>CONCLUSION</u>

Plaintiffs respectfully request the Court enter an order certifying the proposed class for purposes of settlement, preliminarily approving the terms of settlement, and setting a final fairness hearing at least 120 days after entry of the order.

Respectfully submitted this 9th day of May, 2014.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A. | |

19

lharke@harkeclasby.com
Sarah Engel, Esq.
sengel@harkeclasby.com
Howard M. Bushman, Esq.
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, Florida 33138
Telephone:      (305) 536-8220
Facsimile:      (305) 536-8229
*Counsel for Plaintiffs*

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: <u> /s/ Adam M. Moskowitz </u>

21