# E
# X
# H
# I
# B
# I
# T
# D

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 0:13-cv-60721-FAM


IRA MARC FLADELL, SARAH CROUCH,

GREG OLSON, MARGARET

ZAWISTOWSKI, TILENA ALI, DANNY

LANE and BEVERLY LANE on behalf of

themselves and all others similarly

situated,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A., et al,

    Defendants.


    VIDEOTAPED DEPOSITION OF AMIRALI JABRANI

        Taken on behalf of the Plaintiffs


            November 10, 2014

    (Whereupon, the deposition began at 10:01 a.m.)

## Page 2

INDEX OF EXAMINATION

Page

Questions by Mr. Moskowitz......................... 5

INDEX OF EXHIBITS

Exhibit No. 1    three agreements............... 20
Exhibit No. 2    notes.......................... 28
Exhibit No. 3    order.......................... 37
Exhibit No. 4    settlement agreement........... 38
Exhibit No. 5    settlement agreement........... 40
Exhibit No. 6    objection...................... 47
Exhibit No. 7    objection...................... 48
Exhibit No. 8    pleading....................... 56

## Page 4

APPEARANCES

For the Plaintiffs: By Mr. Adam M. Moskowitz
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon, 9th Floor
Coral Gables, Florida 33134
Tel: 305-372-1800 / Fax: 305-372-3508

    By Lance A. Harke
HARKE CLASBY & BUSHMAN, LLP
9699 NE SECOND AVENUE
MIAMI, FL 33138
Phone: 305-536-8220

LOCAL COUNSEL:  By Mr. Peter Woods
    Law Offices of Haar & Woods, LLP
    1010 Market Street, Suite 1620
    St. Louis, Missouri 63101
    (314) 241-2244
The Court Reporter: Ms. Angie Kelly, CSR/CCR
    Missouri CCR No. 1010 Illinois CSR No. 084-004498
    Midwest Litigation Services
    711 North Eleventh Street
    St. Louis, Missouri 63101
    (314) 644-2191
The Videographer: Mr. Dave Willman

## Page 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 0:13-cv-60721-FAM

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly
situated,
        Plaintiffs,
v.
WELLS FARGO BANK, N.A., et al,
        Defendants.
DEPOSITION OF WITNESS AMIRALI JABRANI
produced, sworn, and examined on the 10th day of November,
2014, between the hours of 10:01 in the morning and 11:29 in
The morning of that day, at the offices of Haar & Woods, LLP,
1010 Market Street, Suite 1620, St. Louis, Missouri 63101,
Before ANGIE KELLY, a Certified Court Reporter within the
United States District Court, Southern District of Florida,
Wherein Ira Fladell, et al is the Plaintiff, and Wells Fargo
Bank, et al are the Defendants.

## Page 5

IT IS HEREBY STIPULATED AND AGREED, by and
between counsel for the Plaintiffs and counsel for the
Defendant, that the deposition of AMIRALI JABRANI
may be taken in shorthand by Angie Kelly, a
Certified Shorthand Reporter, and afterwards
transcribed into typewriting; and the signature of the
witness is expressly NOT waived.
            * * * * *
            AMIRALI JABRANI,
Of lawful age, being produced, sworn and examined on
behalf of the Plaintiffs, deposes
and says:
            EXAMINATION
QUESTIONS BY MR. MOSKOWITZ:
        THE VIDEOGRAPHER:  We are on the record.  Today's date
is November 10, 2014 and the time is 10:01 a.m. This is the
videotaped deposition of Amirali Jabrani in the matter of
Fladell verses Wells Fargo Bank.  This deposition is being held
at 1010 Market Street, St. Louis, Missouri.  I'm the
videographer.  Will the attorneys present please introduce
themselves?
        MR. MOSKOWITZ:  For the plaintiffs, Adam Moskowitz and
Lance Harke.
        MR. HARKE:  Morning.
        MR. WOODS:  Morning.  My name is Pete Woods.  I'm here

**6**

1  on behalf of both of the Jabranis and for the record, I'm here
2  solely as local counsel. I have not entered my appearance on
3  either the Wells Fargo or SunTrust Mortgage cases and do not
4  anticipate doing so.
5  (Witness sworn)
6  Q. (By Mr. Moskowitz) Good morning, Mr. Jabrani.
7  A. Good morning.
8  Q. My name is Adam Moskowitz I'm here with Lance my
9  friend and co-league counsel on these cases. Thank you very
10  much for you and your wife for coming here today.
11  A. My pleasure.
12  Q. I know you've been deposed before, I just read one
13  transcript. So just to let you know, I'm going to ask you
14  questions, you swore under oath you're in a court of law.
15  Don't feel -- this shouldn't be a bad experience, I'm just going
16  to ask you questions about what you did, what you objected to,
17  try to understand what your concerns are. We are co-league
18  counsel for the class and we're trying to talk with a lot of
19  class members to find out if there's problems, if there's issues
20  and find out what they are.
21  A. Okay.
22  Q. What is your home address?
23  A. 2038 Moondance, one word M-O-O-N-D-A-N-C-E Moondance
24  Court, O'Fallon, Missouri.
25  Q. Is that the address where you were force placed

**7**

1  insurance or is it a different address?
2  A. It was at the same address.
3  Q. That same address. Was it your decision to file the
4  objection, was it your wife, was it a group decision, how did
5  that come about?
6  A. We both decided to file an objection.
7  Q. Do you know how much you think you were overcharged by
8  these insurance companies for forced place insurance?
9  A. I have no idea. At this point I have no idea.
10  Q. Have you ever talked to them about your issue, your
11  forced place coverage? Who were you force place by.
12  A. Wells Fargo as well as SunTrust.
13  Q. Okay. Do you know who the insurance company was,
14  those are the banks, what about the insurers?
15  A. Insurance company I had State Farm initially and then
16  I switched over to St. Charles Insurance Company, which a broker
17  company.
18  Q. Do you know which insurance company actually force
19  placed you insurance?
20  A. No.
21  Q. Okay. Have you ever tried to find out who charged you
22  insurance?
23  A. I did get a statement if I can recall, saying you'll
24  be charged extra money for forced placed LPCs for LPIs for forced
25  placed insurance. I did get a statement some kind of thing from

**8**

1  SunTrust or Wells Fargo or I could have received it from my
2  insurance broker that St. Charles Insurance Company.
3  Q. Did you pay those amounts?
4  A. Yes.
5  Q. The do you know you much that was?
6  A. No idea.
7  Q. Did you ever ask them to explain why you were forced
8  place, did you lapse your coverage, did you forget to pay?
9  A. No, I never lapsed coverage.
10  Q. Why were you force placed?
11  A. I was with St. Farm Insurance then St. Farm Insurance
12  policy had gone up tremendously, I wanted to shop around. I
13  shopped around with St. Charles Insurance and came up with a
14  better price, so I decided to go that route.
15  Q. Why were you force placed insurance?
16  A. There may be a lapse, not having the coverage, lapse
17  of giving information to SunTrust or Wells Fargo or Chase,
18  whoever the insurance company was maybe the lapse in getting
19  information sent to them.
20  Q. Okay. How much more was the lender place insurance
21  verse what you were paying previously, do you know if it was
22  more, less?
23  A. I have no idea.
24  Q. So do you know if you were unfairly overcharged?
25  A. I feel like I was unfairly overcharged.

**9**

1  Q. Why if you don't know the numbers?
2  A. Because it say in the statement form that you were
3  getting charged so much money extra because of the lapse in
4  insurance, which I didn't have a lapse of insurance not for a
5  single minute.
6  Q. Did you ever ask for that money back?
7  A. I did call both the companies SunTrust as well as
8  Wells Fargo as well as the couple other companies because the
9  information that may have gone out from Chase Insurance -- I
10  mean from St. Charles Insurance Company to mortgage companies to
11  ask for the money back and never received the call, they say
12  that's the way it is.
13  Q. Do you want the money back?
14  A. Now, we got a claim, you know, objection we filed
15  objection and everything. I would like to make sure that the
16  whole class action members get the right amount.
17  Q. So you want us to win, you want the class action to
18  win?
19  A. Class action members to win?
20  Q. Right.
21  A. Yeah.
22  Q. But you've objected to the settlement, how do you want
23  it to be changed?
24  A. There are several reasons why I want to get it
25  changed. If you look at the objections and things the

10

1  information they've read through different is it a different
2  places and from the forms there are several reasons why, first
3  of all, the claim process itself, the settlement process itself
4  is not fair, adequate and easy.
5      Q.   The claims process is not fair?
6      A.   Settlement process is not fair itself, the process
7  itself is not fair.
8      Q.   Why?
9      A.   Because, first of all, there's low number of filing
10  and they have to go on site, Wells Fargo site to fill out an
11  application form I mean the claim for.
12      Q.   Your claims numbers are low?
13      A.   Because the number of filing by the claimants would be
14  low because you have to go on the Wells Fargo site that is
15  determined by Wells Fargo, you go on their site and fill out an
16  application form or claim for.
17      Q.   Why do you have to go on their site, you didn't get
18  one mailed to you?
19      A.   That was that form, I'm talking about for the
20  settlement money that will be dispersed.
21      Q.   Right.  Do you know that people were mailed claim
22  forms?
23      A.   Yeah.
24      Q.   So you don't have to go on the site to get the form?
25      A.   Okay.

11

1      Q.   So you're mailed the form, and what's wrong where
2  that?
3      A.   Besides that one, once the judge gives the final
4  approval, the court gives the final approval then they have to
5  go on the website form, I mean Wells Fargo site which is you
6  have to fill out all the application form go through the whole
7  process which would become people get confused and some of them
8  will say forget it, I don't want to go it.
9      Q.   Did you fill out a claim form?
10      A.   On the computer, on-line.
11      Q.   However, did you submit a claim for Wells Fargo and
12  SunTrust?
13      A.   Yes.
14      Q.   Was it a difficult process?
15      A.   I made a mistake.
16      Q.   Okay.
17      A.   I made a mistake and I had to rectify by sending them
18  again.
19      Q.   So what should have been done?
20      A.   Should have been a lot more easier, lot more easier
21  process.
22      Q.   How?
23      A.   I don't know, I don't know, I'm not I'm just a regular
24  laymen guy.
25      Q.   Right, but you're saying you have to go on and you

12

1  check a box and you fill out your name and information, what
2  could have been done to make it much better?
3      A.   I don't know, I don't know every person, I have
4  master's degree and still I made a mistake, that tells me that a
5  person like me can make mistake, a layman can make mistake too.
6      Q.   Right, but do you have any suggestions or ideas how
7  the claim form itself could have been better?
8      A.   No, I have no idea.
9      Q.   How about the process of filling it out, do you have
10  any specific suggestions how it could be better?
11      A.   No, no, you a guys are class action pros, how would I
12  know.
13      Q.   You said that you fixed the mistake you made, how did
14  you know you had a mistake?
15      A.   I just read it again one more time and then I found
16  out okay, this question meant so-and-so, not so-and-so, so at
17  that time I had to rectify it.
18      Q.   Do you -- did you check that you actually made a
19  payment or that you just were charged, do you remember?
20      A.   No, there were two questions, one was I put down no on
21  both of them, I don't remember exactly, whether we made a
22  payment or we were charged or everything, I put down no and yes,
23  the second one was yes, because they did charge me, and that's
24  how the application claim form came to me.
25      Q.   So you actually were charged and you made a payment on

13

1  it?
2      A.   No, I didn't.  Payment was done through the insurance
3  company or --
4      Q.   They took it from you?
5      A.   Yeah, took it.
6      Q.   Okay.  Are you hoping to get money back?
7      A.   Hopefully I'll get everything back and more, if I need
8  to get more, whatever the thing is.
9      Q.   How would you get more?
10      A.   Whatever the process is, you know, if the claim
11  process is for example you're getting X amount of money, I'm
12  getting X amount of money, whatever the process is.
13      Q.   Do you know how much you're getting under the current
14  settlement with Wells Fargo and SunTrust?
15      A.   Right now, it says I don't know exactly how much.
16      Q.   Do you have a problem with that specific amount,
17  should that amount in your opinion be more or less?
18      A.   I know the claim amount number is $285 million for the
19  whole lawsuit, Wells Fargo.
20      Q.   That's going to be made available to the class?
21      A.   That is under the class.
22      Q.   Okay.
23      A.   That includes attorney fees, class representatives and
24  the class members.
25      Q.   Is that okay?

14

1    A. Guess so.
2    Q. You don't know?
3    A. I don't know.
4    Q. And SunTrust, is the amount that's being made
5 available to the class is that okay?
6    A. I don't how much that would be, I don't know.
7    Q. Okay. So you just think that the claims process
8 should be different?
9    A. It should be more easier, less cumbersome, should not
10 be going through Wells Fargo website and that kind of thing.
11    Q. Anything else that you specifically have a problem
12 with either Wells or SunTrust?
13    A. Both of them, I mean, I don't know, I got a little
14 confused between Wells Fargo and Hamilton, because it's pretty
15 much so similar in the notion so, other second issue is on the
16 same thing on settlement process, we don't know how many members
17 would file the claim, okay, you guys are saying it will be 19,
18 20 percent or so, and historically if you look at it, because
19 it's so cheaper, the percentage that is given out, the
20 percentage of money that is given out through the claim process
21 is 7 percent, 6 to 7 percent not 19 to 20 percent.
22    Q. Who says 19 to 20 percent?
23    A. I don't know exactly, but I read somewhere, I don't
24 know exactly but that's where I found you know, the amount is a
25 lot higher.

15

1    Q. But you think that somebody said it would be 20
2 percent?
3    A. No, I'm not saying 20, it would be a lot higher.
4    Q. Okay.
5    A. The claims would be a lot higher, that's the we're
6 saying, the percentage of the money that is given out would be a
7 lot higher.
8    Q. You say they, who says that?
9    A. From the forms that I read.
10    Q. You think somewhere in the forms it gives a number
11 of --
12    A. It doesn't give a number, but it says a lot higher
13 percentage.
14    Q. So you think it's going to be around 7 percent?
15    A. Historically it should be 6 to 7 percent.
16    Q. And what's wrong that with that, what's your objection
17 on that?
18    A. Objection should be that you guys it historically
19 should be 6 to 7 percent, which the amount will be less than $20
20 million, not the amount that you are saying, because you are
21 projecting that it will be 18, 19, 20 percent.
22    Q. So how does it affect Mr. Jabrani if it's 6 percent of
23 the people decide to fill out claims, how does that hurt you?
24    A. I doesn't hurt, I want to be fair, see the whole
25 objection of this thing is not for me to pocket all the money,

16

1 it's for fairness and reasonable and equitable to all the class
2 members, not only just Jabranis.
3    Q. So if the amount of people that decide to send in
4 claims is 6 percent, how does that hurt the other class members?
5    A. How does it hurt other class members? Because other
6 people will be left out.
7    Q. But you're saying the amount that people get, that's
8 fair, you don't have a problem with the actual amount, whether
9 it's 12.5 percent or 10 percent in terms of what they get back?
10    A. No, I'm not saying, the percentage, how can you be
11 sure on that one too, the amount you are saying you have
12 overcharged 18, 20 percent, from what I gather, 18 percent, 19
13 percent you have overcharged.
14    Q. Where's that from?
15    A. I just read all that stuff, little bit here and there
16 as I told you, I went through all the documents, you know, read
17 the settlement here and there, and this is my notes that I have
18 taken down, now, and you charged them 18 percent and you're
19 willing to give --
20    Q. Whose you?
21    A. As plaintiffs, plaintiff's attorneys, okay, that Wells
22 Fargo would give out 18 to 20 percent, I mean 10 percent, sorry,
23 10 percent.
24    Q. I'm sorry, Wells Fargo is going to give 10 percent of
25 the insurance money back to the plaintiffs?

17

1    A. You collected, overcharged the claimants, okay.
2    MR. WOODS: Ali, you're getting confused, they
3 represent the claimants here.
4    A. Okay.
5    MR. WOODS: They don't represent Wells Fargo or
6 SunTrust.
7    MR. MOSKOWITZ: We represent the class members like
8 you.
9    MR. WOODS: And that's where Wells Fargo and Trust,
10 you're talking about the insurance percentages, I believe, I
11 don't want to prompt you.
12    Q. (By Mr. Woods) Let's walk through this. How did you
13 hear about this case, how did you first hear about it, did you
14 get a notice in the mail?
15    A. I got a notice in the mail.
16    Q. So you opened up the notice?
17    A. Yeah.
18    Q. And what did you do? Did you call your lawyer when
19 you opened it?
20    A. No, what I did was I went to the computer, looked at
21 what the case was all about, okay.
22    Q. Which one is this, the Wells Fargo?
23    A. First I got Wells Fargo, so I went and looked at it.
24    Q. Where did you go, onto the website?
25    A. Website.

18

1   Q.   The settlement website or the Wells Fargo website?
2   A.   Wells Fargo website, or settlement website, I don't
3   know exactly which one it was.
4   Q.   Okay.
5   A.   And got a little summary as to what it was, and then I
6   decided okay, hey, I do have a case here, and I said let me
7   approach the attorney, which is Chris.
8   Q.   Oh, your attorney.
9   A.   My attorney, and see what he thinks about and get his
10  idea on it, take on it, and that's what we decided to go with
11  Chris Bandas.
12  Q.   Okay, so you called -- was he your lawyer on another
13  case?
14  A.   He was any lawyer on another case.
15  Q.   As an objector in a class action?
16  A.   Not as an objector.
17  Q.   How many times have you objected in class action
18  settlements?
19  A.   Just one time.
20  Q.   So he was your lawyer in that case, you called him up
21  and said what?
22       MR. WOODS:  Well, I'll going to object to any
23  conversations specific to the Chris Bandas conversations as
24  protected by attorney-client privilege.
25  Q.   (By Mr. Moskowitz) Okay.  Did you call us, did you

19

1   ever call the people that were designated by the court to be
2   your lawyers, class counsel?
3   A.   I called, if I remember correctly, I called the class
4   action members too, lawyers too, don't know who the person was,
5   I left a message, I remember calling and guess what, the message
6   was left, I never received a call.
7   Q.   Do you know what state did you call?
8   A.   Whatever the number that was given on there, to the
9   class members.
10  Q.   On the notice?
11  A.   On the claims form.
12  Q.   On the claims form.  Did you call the claims
13  administrator?
14  A.   I have no idea, I don't know exactly, I never received
15  a call.
16  Q.   Okay.  And then you called Chris Bandas, you say I got
17  this notice, I'm not going to ask you what you guys exchanged,
18  and then you decided to object to the settlement or did you want
19  to find out more details about the settlement?
20  A.   I decided after probing the information, I decided to
21  hire him as general counsel for me.
22  Q.   What is general counsel, as your lawyer?
23  A.   As a lawyer.
24  Q.   Okay.  Now do you pay Mr. Bandas?
25  A.   No.

20

1   Q.   Okay.  Let's mark as composite Exhibit 1 three
2   agreements that we were handed when we got here, kindly by
3   counsel.
4        (Exhibit 1 marked for identification)
5   Q.   (By Mr. Moskowitz) We've marked as composite Exhibit 1
6   three agreements, one is dated October 28, 2014 that's a letter
7   from Mr. Jabrani to Horan Woods in the SunTrust matter, the
8   second one is dated October 28, 2014 in the Wells Fargo matter,
9   and there's a third agreement I believe with Mr. Jabrani and
10  Chris Bandas.  Is this third agreement, is this what you're
11  talking about you hired Mr. Bandas?
12  A.   Yes.
13  Q.   And do you pay Mr. Bandas to be your lawyer?
14  A.   No, I don't pay, if you read that agreement it tells
15  you exactly.
16  Q.   I just got it, so.
17  A.   If you read the agreement, it will tell you exactly
18  what the agreement is.
19  Q.   Do you have to pay?
20  A.   No, I don't have to pay.
21  Q.   Do you pay any costs to him?
22  A.   No.
23  Q.   And you don't pay any fee to him?
24  A.   No.
25  Q.   What do you get out of being an objector?

21

1   A.   A fair settlement, class action for all the class
2   members.
3   Q.   Okay.  And what else does Mr. Jabrani get, anything
4   else?
5   A.   That's what the main object is.
6   Q.   Right, but what can you stand to benefit from
7   objecting in these cases?
8   A.   I don't see any more on that one, besides being fair
9   to the class members.
10  Q.   Could you get something called an incentive award?
11  A.   Yeah, if there's an incentive award, I will get an
12  incentive award.
13  Q.   Okay, I just want to make sure what you get out of
14  this agreement.
15  A.   Yeah, if there's an incentive award, yeah.
16  Q.   And how much is that?
17  A.   It doesn't specify.
18  Q.   It says you understand any incentive award or payment
19  sought will never exceed $5,000, why is that, do you know?  Did
20  you see that there, it says that there under 3.2, did you talk
21  about that with Mr. Bandas?
22       MR. WOOD:  Well, again, I'm going to object to any
23  conversation with Mr. Bandas as being protected by the
24  attorney-client privilege and instruct the client not to answer.
25  Q.   (By Mr. Moskowitz) Okay.  There's an agreement here

---

**22**

1 that mentions a $5,000, are you aware that you may recover any
2 amount of money as an incentive award period?
3 A. If that's the case, yeah, I will get $5,000, whatever
4 this contact says.
5 Q. Why would you get an incentive award if you object,
6 that's what I'm trying to understand?
7 A. Well --
8 Q. You're not a named plaintiff in this case, so how do
9 you get --
10 A. I am a named plaintiffs, I am a claimant member, claim
11 member.
12 Q. You understand in class actions, if a class action is
13 approved, as part of the case the court may award the named
14 plaintiffs who took the case, who were deposed, who produced --
15 A. Class representatives.
16 Q. Class representatives get incentive awards.
17 A. Okay.
18 Q. So how would you get an incentive as an objector?
19 A. I'm not asking, if that's what he's taking the case
20 you know, and he's awarding me $5,000, I will take $5,000,
21 whatever it is.
22 Q. Who's that from, from Mr. Bandas will give you $5,000?
23 A. Could be anything, whatever it says there.
24 Q. I want to know your understanding.
25 A. It could be anybody, it could be Wells Fargo, it could

---

**23**

1 be you, it could be Chris Bandas, it could be anybody, I don't
2 know exactly.
3 Q. It could be anybody that's going to give you $5,000?
4 A. Yeah.
5 Q. And that's one reason why you're filing the objection?
6 A. No, one of the biggest reason, is let me be very clear
7 on that one.
8 Q. Sure.
9 A. The biggest reason is fairness, reasonableness okay,
10 of all the class members, not just the attorneys or the class
11 representatives, all who are not even present.
12 Q. Okay. So out of the 700,000 or so SunTrust class
13 members, do you know how many people have objected to the
14 settlement?
15 A. No, I believe I am one of them, I know that.
16 Q. Do you know if you're the only one?
17 A. I could be the only one, I could be the only one.
18 Q. Okay. So you're the only one that you believe thinks
19 that somehow the process is not fair?
20 A. Yeah.
21 Q. And you're saying it's not fair because it should be
22 easier?
23 A. It should be easier, less complicated.
24 Q. But you don't know how?
25 A. Once again, I'm not an attorney, I've never filed a

---

**24**

1 class action lawsuit, and I'm not a lawyer, so I would not know
2 what the process is, I would not know what forms to fill out,
3 you guys are pros on that.
4 Q. You don't know how it could be better?
5 A. I don't know.
6 Q. Is there anything else we talked about the incentive
7 awards, you may get $5,000, is there anything else that you
8 would get?
9 A. I don't know, I don't know. Not that I know of, but
10 could be anything, I mean, you know, I may get recoup all the
11 money, what it is, I don't know exactly.
12 Q. Like all the other class members?
13 A. Like all the other class members.
14 Q. Is there anything else this Mr. Jabrani would get
15 specially besides what the class would get?
16 MR. WOODS: Objection calls for speculation. If you
17 know the answer, go ahead.
18 Q. (By Mr. Moskowitz) If you know.
19 A. I don't know.
20 Q. Well an incentive order is one, that would be
21 different than the other 700,000 people?
22 A. Yes.
23 Q. If your lawyers get money, do you share at all in any
24 of that money? If they're awarded a million dollars as an
25 attorney fee, would you get a dollar of it or anything?

---

**25**

1 A. Does it say on that one?
2 Q. I haven't read the whole agreement.
3 A. Read it, I don't know, I mean, I don't know, I don't
4 know.
5 Q. You don't know what you get?
6 A. No.
7 Q. The other two agreements that we've marked dated
8 October 28, did you sign these with Horan Woods?
9 A. Yes.
10 Q. And what is this for?
11 A. This is for he representing me in this deposition
12 section.
13 Q. And it's billed at a rate of $375 an hour?
14 A. Yes.
15 Q. Who pays that?
16 A. Chris Bandas.
17 Q. You don't have to pay?
18 A. I don't, because it's specified in that contract.
19 Q. And is this how you did it in the prior case where you
20 were an objector, you didn't have to pay any hourly fee?
21 A. No.
22 Q. There's a fourth agreement we just don't have here
23 between you and Mr. Bandas for the Wells Fargo case?
24 A. Yes.
25 Q. To be signed?

---

26

1  A.  Yes.
2  Q.  Did your wife sign these as well?
3  A.  Yes.
4  Q.  And it's the same agreement?
5  A.  Yes.  That was somewhat, a lot more issues too.
6  Q.  I'm sorry?
7  A.  There were a lot more issues that you talked about,
8  you know, why you were objecting.
9  Q.  Okay.  Thank you.
10  A.  The other one is the injunction.  You know, they're
11  making a big deal that it's a big injunction, is a big plus for
12  the class members, and it's not, it's still very unfair because
13  Wells Fargo, their injunction is for the future process, future
14  process of doing things like business, okay, not for the present
15  members, it's not helping the present members.
16      Second thing they're talking about is what happened
17  was they got caught in the cookie jar.  Now anybody that had to
18  stop doing the same practice, because otherwise guess what, they
19  would get slapped again with another lawsuit.
20  Q.  Okay.
21  A.  And the last thing that I want to talk about is that
22  prohibition of the same practice is for five years.
23  Q.  Okay.  So you read the settlement agreement,
24  Mr. Jabrani yourself and you figured these three things
25  yourself?

27

1  A.  No.
2  Q.  Or did you talk to an expert?
3  A.  Expert, would talk to an expert you take counseling
4  you look at objections, you talk to --
5  Q.  No, no, no I mean Mr. Jabrani, you?
6  A.  Uh-huh.
7  Q.  Explain again, you went on the Internet website you
8  printed out the settlement agreement?
9  A.  No, I didn't print out the settlement, that was just a
10  summary I read.
11  Q.  Okay.
12  A.  But then I got the settlement, correct.
13  Q.  From who?
14  A.  From counsel.
15  Q.  From Mr. Bandas?
16  A.  Could be anybody, okay, but I did get settlement from
17  him.
18  Q.  You got the actual agreement?
19  A.  Yes.
20  Q.  Did you read it yourself?
21  A.  I browsed through it myself.
22  Q.  How long did you spend on it, a couple weeks or a
23  couple minutes?
24  A.  Couple of hours.
25  Q.  Couple of hours, did you talk to any experts yourself?

28

1  A.  Yeah.
2      MR. WOODS:  Other than conversations you may have had
3  with your attorneys.
4  A.  Okay, no.
5  Q.  (By Mr. Moskowitz)  Okay.  So you were sent the
6  settlement agreement, you talked about it, I don't want know the
7  details of what you and your lawyers said about the settlement
8  agreement, and then you came to the conclusion that these three
9  incentive relief insures are a problem?
10  A.  Yes.  There are other ones too, if you want I can tell
11  you some more, but.
12  Q.  Oh, sure, I want to hear them all today.
13  A.  Okay.
14  Q.  The first one you think is it's not going to help
15  Wells Fargo, it's going to be in the future so it won't help
16  present members?
17  A.  Yeah, the process, I've got notes written down too,
18  what it is.
19  Q.  What were those notes from, a conversation?
20  A.  From objections, you know, reading objections.
21  Q.  Are these from a conversation with your lawyer?
22  A.  No, I mean, things that I put down, lawyers taking his
23  advice, taking everybody's advice, reading objections and
24  filling out my own form, this is all mine.
25  Q.  Okay.  So who else besides counsel did you talk to to

29

1  generate those notes?
2  A.  No, nobody else.
3  Q.  Just your counsel?
4  A.  Just my counsel, objections that I read, the
5  settlements that I read, everything, and that's how I created my
6  notes.
7  Q.  Okay.  Can we mark that as an exhibit?
8  A.  Sure.
9  Q.  I'll mark it as Exhibit 2.  So the only people you
10  talked to about your objections is your counsel?
11  A.  Counsel, yeah.
12  Q.  Because you keep saying and other people I just want
13  to make sure.
14  A.  Paperwork I'm talking about, I never said other
15  people.  I said other forms and paperwork that was given to me.
16  Q.  By counsel?
17  A.  By counsel.
18  Q.  Okay.  What's the other, the settlement agreement?
19  A.  Settlement objections.
20  Q.  Your objections?
21  A.  My objections.
22  Q.  Because nobody else objected?
23  A.  My objections.
24  Q.  Did you draft your objection or did your counsel
25  draft?

30

1  A. Nobody draft the objections.
2  Q. The objections you filed in this these cases.
3  A. Uh-huh.
4  Q. Did you a type them up?
5  A. Oh, draft it, okay, no I didn't draft it, I did not.
6  Q. So what did you do in terms of the objections, did you
7  dictate a message, did you send an e-mail to your lawyer?
8  A. I brought a consent to him and he's the pro at that
9  business, so I said okay, you whatever you say, I'll go with.
10  MR. WOODS: Again I'm going to object to any
11  conversation you had with your attorneys. I don't want you
12  testifying about anything that you said to an attorney or an
13  attorney said to you or written communications to or from your
14  attorneys.
15  A. Okay.
16  MR. WOODS: You can testify about what you've read,
17  and what you've surmised from reading the documents.
18  Q. (By Mr. Moskowitz) Okay, good advice. You said he's a
19  pro in that business, Mr. Bandas, what does that mean?
20  A. He's a professional just like you are, as a counsel.
21  Q. Professional in what business?
22  A. As a counsel.
23  Q. As a counsel. Do you know his experience in lender
24  place insurance cases?
25  A. Not really.

31

1  Q. Do you know if he's ever litigated a lender place
2  case?
3  A. I've dealt with him on one case that is.
4  Q. I'm sorry?
5  A. He has handled my case, more than one case, that's.
6  MR. WOODS: The CertainTeed case?
7  A. Right, the other type of case.
8  Q. (By Mr. Moskowitz) But do you know if he's ever done a
9  lender place insurance case?
10  A. I haven't read up on everything.
11  Q. Have you talked to him and have you understood him to
12  have ever litigated a lender place insurance case?
13  A. No.
14  Q. Do you know if he has retained any experts?
15  A. From what I see now, yes, he could have hired experts,
16  yes.
17  Q. In lender place insurance?
18  A. In this particular case.
19  Q. Who?
20  A. This particular case like Wells Fargo case.
21  Q. Right, you say he did or?
22  A. He must have.
23  Q. Why?
24  A. Because the why I mean, you know, because you need
25  professional expertise in every area, I mean.

32

1  Q. Do you know a person's name that he's hired?
2  A. Yeah, from what I gather, his name is Santiago Cueto
3  C-U-E-R-T-O.
4  Q. Santiago Cueto.
5  A. Cueto and the other one is Ted Frank who drafted
6  that -- who was the brain behind writing all that thing.
7  Q. Okay. Are those lawyers, do you know?
8  A. One is a lawyer.
9  Q. Which one?
10  A. Santiago.
11  Q. Santiago Cueto?
12  A. Cueto.
13  Q. And he's a lawyer?
14  A. Yeah, he's a lawyer.
15  Q. And he's an expert?
16  A. Once again, I'm depending on Chris Bandas to do all
17  the work.
18  Q. Is Mr. Cueto your lawyer?
19  A. No, he's representing me okay.
20  Q. Do you have an agreement with Mr. Cueto? You know we
21  looked at composite Exhibit 1 with four agreements, do you have
22  any written agreements with Mr. Cueto?
23  A. No.
24  Q. Do you have any written agreements with Mr. Frank?
25  A. No.

33

1  Q. But both are your lawyers?
2  A. Both of them are my lawyers because general counsel,
3  Chris Bandas is my general counsel and he hired to represent me
4  in those cases.
5  Q. Do you know if there's an agreement between Mr. Bandas
6  and Mr. Frank?
7  A. Could be.
8  Q. But you don't know?
9  A. I don't know.
10  Q. Have you ever talked to Mr. Frank?
11  A. No.
12  Q. Have you ever talked to Mr. Cueto?
13  A. No.
14  Q. Have you ever had any conversations with Mr. Frank or
15  Mr. Cueto, whether on the phone or an e-mail or a letter?
16  A. No.
17  Q. You've never had any contact with them?
18  A. No.
19  Q. Do you know how they're getting paid in this matter?
20  A. No.
21  Q. Do you know what the legal claims are that were
22  asserted in the Wells Fargo or SunTrust cases?
23  A. What do you mean by legal claim?
24  Q. What the claim was, the cause of action?
25  A. $21 million.

34

1  Q.  No, not the amount of money, the actual legal claim
2  against Wells Fargo and SunTrust?
3  A.  You tell me.
4  Q.  Okay.  Do you know any of the lawyers are in those
5  cases representing the class?
6  A.  I read so many names in the settlement, I don't
7  remember.
8  Q.  Do you know any of the named plaintiffs in either of
9  the cases?
10  A.  Yeah, I saw the names with the signatures and
11  everything, but I cannot remember.
12  Q.  Do you know any of the rulings that the court ordered
13  in both cases?
14  A.  Once again, I read it, the settlement, but I don't
15  remember.  I do remember some of the settlement part of it, you
16  know, like for example, Florida has to do, so it's due dates of
17  everything, what the descriptions of everything, what the
18  description of --
19  Q.  No, I mean in terms of what the court, while the case
20  was being litigated, before it settled, do you know any of the
21  facts?
22  A.  No.
23  Q.  You don't know the case, was it winning, was it
24  losing?
25  A.  No.

35

1  Q.  You don't know the strength of the claims?
2  A.  No.
3  Q.  In terms of the injunctive changes, do you
4  specifically know what they are, what Wells Fargo and SunTrust
5  and Assurant and QBE are being required to do?
6  A.  I have a general idea, but not what I told you, I
7  mean.
8  Q.  You said that you think the prohibition of five years
9  is not right, or you don't really know?
10  A.  I truly don't know.
11  Q.  Okay.  And you don't have an opinion on whether the
12  specific amounts that will be given back after you fill out a
13  claim form are too high or too low?
14  A.  I told you it's too low.
15  Q.  No, you said the take rate, the amount of people that
16  would claim is too low, but in terms of the actual number that
17  you get if you fill out a form, you don't have an opinion on
18  that?
19  A.  I don't have any idea.
20  Q.  Did you receive an incentive award in that prior case
21  you said you served as an objector?
22  MR. WOODS:  I'm going to object to any specifics about
23  the prior actions, it's a confidential settlement that he's
24  precluded from addressing.
25  Q.  (By Mr. Moskowitz)  Okay.  Did you have a

36

1  confidential, I don't want know the details, you had a
2  confidential settlement where you received something?
3  A.  Yes.
4  Q.  But you can't say what you received?
5  A.  I can't say.
6  Q.  Fair enough.  Have you ever filed a claim in a
7  class action where you didn't object, you know you received the
8  notice in the mail, you fill out the claim form?
9  A.  I have never objected, I received so many of them in
10  my period of 35 years or 34 years.
11  Q.  My question is, did you fill them out, you never
12  filled out a claim?
13  A.  No.
14  Q.  Did you ever think about filing your own forced place
15  insurance lawsuit?
16  A.  No.
17  Q.  Why?
18  A.  Say it again.
19  Q.  Did you ever think about being a class representative
20  in your own forced place insurance case?
21  A.  I didn't even know that existed until now, until the
22  form was filled out and sent to me.
23  Q.  Were you told that you have the option to opt out of
24  the settlement if you don't it think it's a good settlement and
25  you can pursue your own claim?

37

1  A.  I read it, but you need a lot of money and lot of
2  investigation and everything, so I decided why go through that
3  hassle.
4  Q.  Okay.
5  A.  Now you want to know a little bit about --
6  MR. WOODS:  Ali, just answer the questions when
7  they're asked of you, please.
8  Q.  (By Mr. Moskowitz) Did you ever research any of the
9  cases that Mr. Bandas brought with other objectors to see the
10  results?
11  A.  No.
12  Q.  Do you know if any courts have sanctioned him or
13  withdrew his admission to the court?
14  A.  I've heard about it.
15  Q.  How?
16  A.  But I don't know.
17  Q.  Is it just through discussions with Mr. Bandas?
18  A.  Just prior deposition.
19  Q.  Oh, somebody asked you about it?
20  A.  Yes.
21  Q.  Are you planning on going to the appeal hearing in
22  either the SunTrust matter or the Wells Fargo matter?
23  A.  I have no problem, if it's called for, yeah I will.
24  Q.  But you don't have a plan now?
25  A.  I don't have a plan now.

38

1  Q.  Did you read the final approval order in the SunTrust
2  case?
3  A.  On SunTrust.
4  Q.  Why don't we -- final settlement you're talking about,
5  right?
6  A.  Yeah, approval.  I browsed through it.
7  (Exhibit 3 marked for identification)
8  Q.  This is Exhibit 3 it's the order granting final
9  approval where the court considered all of the arguments, how
10  long did you spend reading this order, and you could be honest
11  if it wasn't a lot?
12  A.  It wasn't much, about half an hour, not even half an
13  hour.
14  Q.  Fifteen minutes?
15  A.  Less than half hour.
16  Q.  Okay.  Less than a half hour, and what did you do?
17  A.  Just read and saw the amount like how many people were
18  getting affected, like 60,000 homeowners across the country.
19  Q.  When did you read this, this was entered 10/29,
20  September 29.
21  MR. WOODS:  It was entered 10/23 but filed 10/29.
22  Q.  (By Mr. Moskowitz) So 10/23, how did you get?
23  A.  10/23.
24  Q.  Your lawyer sent it to you?
25  A.  Yeah, I received it, yeah.

39

1  Q.  Okay.  And then you read it less than 20 minutes?
2  A.  Yeah, spent a little time on it.
3  Q.  Do you agree or disagree with Judge Kohn?
4  A.  It's so confusing so me, I read it I don't understand
5  too much of it.
6  Q.  You don't understand too much of it?
7  A.  I don't understand.
8  Q.  You don't understand?
9  A.  No.
10  Q.  Did you keep records of your forced place insurance,
11  because when you checked there that you actually made a payment,
12  you have the records?
13  A.  Yeah, I didn't keep track of the records and
14  everything, but they took it out from my account, I know that.
15  (Exhibit 4 marked for identification)
16  Q.  Okay.  I'm going to show you what we'll mark as
17  Exhibit 4 is the settlement agreement in SunTrust.  Mr. Jabrani,
18  I'll show you what we marked as Exhibit 4, the 59 page
19  settlement agreement.  You said you spent a little less than 20
20  minutes or so on the order, how long did you spend yourself
21  reading the settlement agreement?
22  A.  Settlement agreement of Wells Fargo I spent about an
23  hour, hour and 20 minutes or something.
24  Q.  When did you receive it?
25  A.  When I received it.

40

1  Q.  Around May of 2014?
2  A.  No, couple of days ago.
3  Q.  The settlement agreement, okay, so you first read the
4  settlement agreement a couple days ago, and you spent about an
5  hour on it?
6  A.  Hour and 20 minutes, something like that.
7  Q.  And this is the settlement agreement that's 59 pages
8  in the SunTrust case, right?
9  A.  Uh-huh.
10  Q.  Okay.  Did you also review the settlement agreement in
11  the Wells Fargo case?
12  A.  This is the Wells Fargo one.
13  Q.  Right, if you look at the caption this is SunTrust?
14  A.  Right, okay, no this one I spent half an hour, less
15  than half an hour.
16  Q.  The SunTrust one, I want to be clear, you're correct,
17  Exhibit 4 which is the SunTrust settlement agreement reached in
18  May, a couple days ago you read it for the first time and you
19  spent less than a half hour?
20  A.  About half hour.
21  Q.  Do you know how many days ago it was?
22  A.  Couple of days ago.
23  Q.  Couple of days ago.  That was the first time you ever
24  saw it?
25  A.  Uh-huh.

41

1  Q.  Now, the Wells Fargo one, I'm going to mark as Exhibit
2  5, I want you to keep both in front of you just so you're clear
3  we just marked as Exhibit 5 the settlement agreement in the
4  Wells Fargo case which is 68 pages long, it was first signed in
5  March, 2014, did you just see this for the first time a few days
6  ago as well?
7  A.  Yes.
8  Q.  So the SunTrust one you spent?
9  A.  Half an hour.
10  Q.  Half hour and then a few days ago you read the Wells
11  Fargo one, how long did you spend?
12  A.  One hour and 20 minutes, 30 minutes.
13  Q.  So you read it and then you had a call with Mr. Bandas
14  about it?
15  A.  I didn't call Chris Bandas, no.
16  Q.  Did you have a conversation with him about it?
17  A.  I had conversation with other attorney.
18  Q.  Okay.  Don't tell me the context but was it, okay so a
19  few days ago for the first time you saw a settlement agreement,
20  right?
21  A.  Yes, yes.
22  Q.  And you had a conversation with your counsel whose
23  here today, anybody else?
24  A.  Nobody else.
25  Q.  The agreement that we looked at in Exhibit 1 has

42

1 October 28 on the date, does that help you remember exactly when
2 you got it, because today's Monday, like on Friday or Thursday?
3     A.   Friday.
4     Q.   So this past Friday, November 6 was the first time
5 you've seen the settlement agreement in Wells and SunTrust?
6     A.   Yes.
7     Q.   Do you know the difference between the settlement
8 agreements between Wells Fargo and SunTrust?
9     A.   Not too much.
10     MR. MOSKOWITZ:  Why don't we take a five minute break.
11     (Whereupon, off the record)
12     (Back on the record)
13     Q.   Mr. Jabrani, before the break we were looking at part
14 of composite Exhibit 1 is your fee agreement with Mr. Bandas, do
15 you see that?
16     A.   Yes.
17     Q.   You said we have an identical one that we'll get for
18 the Wells Fargo case, right?
19     A.   Yes.
20     Q.   And it's dated July 26, I just want to try to
21 understand that as of the date of July 26 when you agreed to
22 object in this case, you hadn't seen the settlement agreement
23 yet, right?
24     A.   Yes.
25     Q.   You didn't see the order granting preliminary

43

1 approval, did you?
2     A.   Just the summary that I saw on the computer.
3     Q.   So at this time you spoke to Mr. Bandas and you saw a
4 summary on a website about the settlement?
5     A.   Yes.
6     Q.   And is that it?
7     A.   That is it.  Now I want to clarify one thing, is we
8 had, I had met Chris I mean Mr. Woods on Monday not Friday,
9 Friday was the day that I reviewed the paperwork, I did receive
10 it about a week ago.
11     Q.   But as of this date, July 26 when you agreed to
12 object, you hadn't read the settlement agreement?
13     A.   No.
14     Q.   And sitting here today, you don't have any specific
15 changes where you would change the settlement agreement?
16     A.   I've done objections, got objections and I'm relying
17 on those objections through my general counsel, Chris Bandas,
18 and --
19     Q.   So he's asserted certain problems with the settlement?
20     A.   Yes.
21     Q.   And did he draft those objections?  Who wrote them?
22     A.   I don't know who wrote it, but he, whether Ted Frank
23 wrote it or he wrote it, I don't know, but I'm relying certainly
24 on the objections and his expertise.
25     Q.   Right, but what I'm saying is you didn't write the

44

1 objections?
2     A.   No.
3     Q.   So Mr. Bandas or Mr. Frank wrote the objections?
4     A.   Yes.
5     Q.   And you're relying upon their work?
6     A.   Yes.
7     Q.   Is one of your goals, one of them today to possibly
8 get an incentive award for this, one of them?
9     A.   No, the biggest award that I can get today is fairness
10 equitable for all the class members, but could be one of them,
11 too.
12     Q.   It could be one of them?
13     A.   Could be.
14     Q.   And he would get an incentive award of up to $5,000?
15     A.   Could be.
16     Q.   By objecting, do you know that the court then either
17 approves it or wipes it out?
18     A.   I understand that.
19     Q.   So how does it help the class if that no court says
20 considering Mr. Jabroni's objection, no approval go away?
21     A.   I believe that defendants and the plaintiff's
22 attorneys could really come -- really look at the fund a little
23 better and work out that way the funds will be, more award will
24 be given to the class members.
25     Q.   Who told you that or how do you know they could change

45

1 the deal?
2     MR. WOODS:  Again, I'll object to the extent it calls
3 for attorney/client privilege.
4     Q.   (By Mr. Moskowitz) Is the only way you know that
5 through talking through a lawyer?
6     A.   Through objections, through you know, through counsel
7 and everything, through objections you can read it, allocation
8 of money and everything.
9     Q.   You think you could reallocate the money through an
10 objection?
11     A.   No, I'm not saying you can, okay, by making defendants
12 and attorneys, plaintiff's attorneys can reallocate it through a
13 judge, through court system.
14     Q.   Okay.  Do you know what an appeals bond is, have you
15 ever been told that you may have to post a bond with the other
16 case?
17     A.   Yes.
18     Q.   Are you going to be paying those bond amounts?
19     A.   No.
20     Q.   Who's going to pay those?
21     A.   Chris Bandas?
22     Q.   Definitely not you?
23     A.   Definitely not.
24     Q.   Can you pay an appeals bond if the court requires it?
25     A.   No idea, I mean.

46

1    Q.  Do you have money to pay an appeals bond, if --
2       MR. WOODS:  Objection calls for speculation, there's
3   no foundations for the amount.
4       Q.  (By Mr. Moskowitz) If the court requires you to post a
5   bond of example for $10,000 for appealing the case, could you
6   Mr. Jabrani pay it?
7       A.  Right now at this point, no idea.
8       Q.  But you're understanding is you don't have to pay?
9       A.  Yeah.
10      Q.  In your agreement with Mr. Bandas, right?
11      A.  Yes.
12      Q.  Under this agreement, do you have the right to decide
13  whether to drop your objection or proceed?
14      A.  I'm strictly relying on Mr. Chris Bandas to make the
15  decision.
16      Q.  Section 2.3 here on the second page says, in return
17  for your agreement of representation herein, attorneys agree
18  that no settlement or resolution will be made of your objection
19  or any appeal therein without your prior approval and you shall
20  retain the right to determine whether to proceed with this
21  objection or any appeal thereon, including the right to approve
22  any settlement or resolution of the same?
23      A.  Yes.
24      Q.  Do you know what that means?
25      A.  Uh-huh.

47

1       Q.  Could you settle your objection today for say $10,000
2   if you wanted to?
3       A.  From this paragraph, but I would rely once again on my
4   attorney, general counsel, Chris Bandas.
5       Q.  To give you advice?
6       A.  To let me know who to do.
7       Q.  But at the end of the day it's your decision?
8       A.  It's my decision.
9       Q.  And sitting here today, would you settle for a certain
10  amount of money, and you just haven't determined what that
11  amount would be?
12      A.  I've not determined yet.
13      Q.  Do you know if you would settle for $10,000?
14      MR. WOODS:  Objection, asked and answered, he said
15  that he had no idea.
16      Q.  (By Mr. Moskowitz) Sure, because he didn't say the
17  amount but I'm giving you an example, if you were offered
18  $10,000 to settle your objection, would you consider that?
19      A.  I would consult my attorney.
20      Q.  And hear his advice?
21      A.  Yes.
22      Q.  Is there a certain amount of money, not saying the
23  exact amount yet, that you would be interested in withdrawing
24  your objection?
25      A.  Once again, I would have to approach my attorney.

48

1       Q.  To find out what that amount would be?
2       A.  Not to find out what amount would be, what would be
3   the best thing to do for you.
4       Q.  I'm going to show you what we'll mark as Exhibit 6.
5       (Exhibit 6 marked for identification)
6       Q.  Mr. Jabrani, I handed you what we've marked
7   Exhibit 6, it's a 23 page document in the Wells Fargo case
8   entitled objection of Amirali Jabrani and Janet Jabrani, right.
9   This is the objection that you said before that you relied on
10  Mr. Bandas or Mr. Frank to draft, you didn't draft this?
11      A.  No.
12      MR. WOODS:  Just for the record, this is I believe 22
13  page document.
14      MR. MOSKOWITZ:  Oh, it says 1 of 23 on the cover.
15      MR. WOODS:  I think you said 26.
16      MR. MOSKOWITZ:  Oh, okay.
17      MR. WOODS:  Either case --
18      MR. MOSKOWITZ:  Thank you.
19      MR. WOODS:  It's something other than --
20      MR. MOSKOWITZ:  23.
21      MR. WOODS:  Yeah.
22      Q.  (By Mr. Moskowitz) Okay.  So you didn't draft this?
23      A.  No.
24      Q.  You didn't e-mail this to them?
25      A.  No.

49

1       Q.  Did you see it recently?
2       A.  Yeah, recently.
3       Q.  Maybe on Monday?
4       A.  Last Monday.
5       Q.  So last Monday was the first time you saw what we
6   marked as Exhibit 6?
7       A.  Yes.
8       Q.  You didn't see it before it was filed?
9       A.  No.
10      Q.  Okay.  Let's look at Exhibit 7.
11      (Exhibit 7 marked for identification)
12      Q.  (By Mr. Moskowitz) Mr. Jabrani, I've handed you what
13  we've marked as Exhibit 7, it's a two part document, the first
14  is, it says objection of Amirali Jabrani and Janet Jabrani and
15  SunTrust, it's five pages long and then it has a bunch of
16  exhibits which were attached to it.  Is your testimony the same
17  that the first time you saw the SunTrust objection was maybe
18  last Monday, with your counsel?
19      A.  Yes.
20      Q.  And you didn't see this before it was filed.
21      A.  No.
22      Q.  If you look at the second part, there's an affidavit
23  here that you had signed, do you see it's the second page right
24  after Exhibit A here, if you look at the second page of it, is
25  that your signature?

50

1   A.  Yes.
2   Q.  Did you sign this?
3   A.  Yes.
4   Q.  Are you sure?
5   A.  That's my signature.
6   Q.  And did you prepare this or your lawyers prepare this
7   for you?
8   A.  My lawyers prepared.
9   Q.  And they asked you to sign this?
10  A.  Yes.
11  Q.  Number 6 says I am represented by Steven Santiago, do
12  you know who that is?
13  A.  As I told you, is --
14  Q.  Is that Santiago Cueto?
15  A.  No, I don't know.
16  Q.  You don't know?
17  A.  I don't know.
18  Q.  You don't know who Steven P. Santiago is?
19  A.  No, I know Santiago --
20  Q.  Cueto?
21  A.  Cueto, from --
22  Q.  Did you read this before you signed this under oath
23  because this says I declare under penalty of perjury?
24  A.  I signed it.
25  Q.  Right.  But so why did you put here number 6 I am

51

1   represented by Steven P. Santiago?
2   A.  Once again, I depend upon Chris Bandas who's a general
3   counsel to follow through and get legal people, I mean, experts
4   in their field.
5   Q.  But did you review this before you signed it?
6   A.  I read it.
7   Q.  You did?
8   A.  I read it, but it didn't mean that I, you know once
9   again depend on him.
10  Q.  But when you read this, what did it mean to you,
11  number 6?
12  A.  I represented by so-and-so people, so-and-so person.
13  Q.  But you don't know who this is?
14  A.  I don't know.
15  Q.  And you didn't have anything to do with putting this
16  whole exhibit together?
17  A.  No.
18  Q.  You don't claim in this case either SunTrust or Wells
19  Fargo that class counsel are getting too much in attorney's fees
20  do you?
21  A.  Yes.
22  Q.  How much is too much, how much are we getting that we
23  shouldn't get?
24  A.  From information I gathered from objection and
25  everything, you're getting $19 million from Wells Fargo

52

1   settlement and about $3.6 from SunTrust.
2   Q.  And how much should we get?
3   A.  I don't know how much you should get, but it's very
4   unfair, very not reasonable, because as I told you, the claim
5   historically is a lot, you know, is a lot lower, less than $20
6   million and so we had other things for example you say you know,
7   whatever money is not left will go back to Wells Fargo, you
8   know, will go back to Wells Fargo which is not fair.  If you
9   have accepted $281 million of the settlement, all the money
10  should go to the class members, not a portion of it.
11  Q.  Who do you mean money, do you think that there's a
12  common fund in this case?
13  A.  No.
14  Q.  So there's no pool of money?
15  A.  Okay.  That's $281 million settlement from your
16  settlement.
17  Q.  Your understanding is there's a pot of $280 million
18  that's being made available for the class as a group?
19  A.  $281 million is available that from there you take out
20  attorney fees, class representatives and rest class members.
21  Q.  Who told you that?
22  A.  From what I read.
23  Q.  You think that there's a common fund settlement of
24  $280 million?
25  A.  I don't know exactly if it's a settlement or not.

53

1   Q.  What if you're wrong, what if there's not a common
2   fund that's going back to the defendants, but that a certain
3   amount is being made available that people could claim, would
4   that make a difference in your objection?
5   A.  Once again, I'm depending upon Chris Bandas to do the
6   legal counseling okay, to do the legal objections and
7   everything.  What I remember is the money getting reverted back
8   to Wells Fargo, any money that is not being used, and on this
9   side, Wells Fargo is saying, oh, we're not going to contest it,
10  whatever legal fees you're getting, plaintiff's attorneys are
11  getting, we're not going to contest it.  So who's looking out
12  for the welfare of the class members, that is my concern.
13  Q.  Yeah, but you're saying there's money that's going to
14  go back to the defendants, but who told you that there's some
15  pool of money that's sitting out there that's being made
16  available to the class, that's what I don't understand?
17  A.  From the claims, from the objection, as well as from
18  the counseling that I get.
19  Q.  Would it matter if that's not the case that there's no
20  reverter back to the defendant, because there's no common fund,
21  did anybody explain that to you?
22  MR. WOODS:  Object as vague and ambiguous question, I
23  think we're mixing issues here.
24  MR. MOSKOWITZ:  Okay, we got the form objection,
25  federal court.

```
                                                            54
1    Q.  (By Mr. Moskowitz) Do you understand there's no common
2    fund that's being distributed that reverts back to the
3    defendant, that's not this settlement, does that make a
4    difference to you?
5    A.  Once again, I depend upon --
6    Q.  You don't understand?
7    A.  I don't understand that part.
8    Q.  Okay.  You just think that the attorney's fees are too
9    high, but you don't know what amount should be awarded?
10   A.  Right now it shows $19 million and $3.6 million.
11   Q.  Right.  What should that amount be?
12   A.  I have no idea, but I'm looking at this way, class
13   will be, the class members, we don't know how many class members
14   will be filing the lawsuit.
15   Q.  Did anybody tell you the numbers were given to the
16   court, you weren't informed in SunTrust, nobody told you the
17   amount?
18   A.  I'm talking about Wells Fargo and SunTrust, you know,
19   we're combining.
20   Q.  In SunTrust, did anybody tell you what the claims rate
21   was?
22   A.  I read a little bit about it.
23   Q.  Where'd you read it?
24   A.  Some settlement, or something, 60, I don't know
25   exactly.
```

```
                                                            55
1    Q.  You don't know what the claims rate was?
2    A.  No.
3    Q.  So how do you know if it's too high or too low?
4    A.  Once again, I depend upon Chris Bandas.
5    Q.  You let him and he thinks it's too low?
6        MR. WOODS:  I'm going to object again to the extent
7    that you may be quoting information provided from his attorney.
8    To the extent that you're relying and focused on your formal
9    objection, you can say so, but I don't want you quoting
10   anything.
11   Q.  (By Mr. Moskowitz) I just want to know Mr. Jabrani, I
12   don't want to know if Mr. Bandas thinks it's too high or too
13   low, I just want to know the facts of what you know, do you
14   know?
15   A.  I don't know.
16   Q.  You don't know how many claims were filed?
17   A.  No.
18   Q.  You don't know how many claims will be filed?
19   A.  No.
20   Q.  Do you know if Mr. Frank is involved in your appeals
21   or whether he decided not to join the appeals in your case?
22       MR. WOODS:  Objection, there's been no appeal filed as
23   far as I know and you're calling for speculation.
24   Q.  (By Mr. Jabrani) I'm asking you, is it your intention
25   that Mr. Frank will be involved in any appeal that you file?
```

```
                                                            56
1    A.  No idea.
2    Q.  You don't know?  You keep saying Mr. Bandas is my
3    general counsel, do you mean just my lawyer, or is there
4    something about the word general counsel that is different from
5    he's your lawyer?
6    A.  He gives me advice and then obviously has to approach
7    the experts like Ted Frank, whoever these people are, and gets
8    the right people, experts in their own fields, whether framing
9    them, drafting the letters, whatever it was.
10   Q.  So you've worked with him in a prior case where you
11   objected in the CertainTeed case.
12       MR. WOODS:  CertainTeed.
13   Q.  (By Mr. Moskowitz) CertainTeed?
14   A.  CertainTeed.
15   Q.  Okay, and now this one, and then do you have other
16   objections that you're going to be working with Mr. Bandas?
17   A.  No, not that I know of right now.
18   Q.  Okay.  If you get a class action notice, do you always
19   call him, is that your practice?
20   A.  No.
21   Q.  Okay.
22   A.  This is my second case.
23   Q.  There's a document that was filed in the Wells Fargo
24   case called Joinder to Jeffrey Nadu's Objection, I could show it
25   to you, but you've never seen it before, right?
```

```
                                                            57
1    A.  No.
2    Q.  You don't see any of the pleadings that are filed in
3    the case by Mr. Bandas for you, he just files them?
4    A.  He filed them.
5    Q.  Without showing them to you.  Like I could show you
6    this one, mark it, I guess we could mark it, there's one
7    Objector's Jabrani's reply to defendants joint response, did you
8    see these?
9    A.  No.
10   Q.  Is there a reason that you didn't come to the final
11   fairness hearing, either in Wells Fargo or SunTrust, you
12   personally?
13   A.  No reason, I mean, I didn't even know this was one.
14   Q.  You didn't know that there was a hearing on final
15   approval, Mr. Bandas never told you about that?
16   A.  No.
17   Q.  Do you know if anybody was going to appear on your
18   behalf, whether Mr. Cueto, Mr. Frank or Mr. Bandas at either the
19   SunTrust or the Wells Fargo final fairness hearings?
20   A.  No idea.
21   Q.  Let me show you what we'll mark as Exhibit 8.
22       (Exhibit 8 marked for identification)
23   Q.  Mr. Jabrani, I've shown you what we've marked as
24   Exhibit 8, it's a pleading in the Wells Fargo case says notice
25   of joinder and Objector Jeffrey M. Nadu's response to notice on
```

58

1   proposed settlement, and it says objectors Amirali Jabrani and
2   Janet Jabrani filed a joinder, you've never seen this form
3   before, right?
4       A.  No.
5       Q.  And Mr. Bandas never discussed this form with you?
6       A.  No.
7       Q.  And Mr. Bandas never explained or discussed with you
8   the merits of the substance of this motion?
9       MR. WOODS:  Again, I'll object to any conversations he
10  had with his attorney, and Ali do not respond to questions
11  relative to your conversations with your counsel, by
12  volunteering information or otherwise, you understand that?
13      Q.  (By Mr. Moskowitz) Mr. Jabrani, you've never seen this
14  form before?
15      A.  No.
16      Q.  And nobody, I'm not asking you what you discussed with
17  your attorney, nobody had discussed the substance of Exhibit 8
18  with you?
19      A.  No.
20      MR. MOSKOWITZ:  Okay.  Why don't we take a five minute
21  break, and I probably have two minutes left.
22      (Whereupon, off the record)
23      (Back on the record)
24      Q.  Mr. Jabrani, before the break you had mentioned
25  another lawyer Mr. Ted Frank but said you've never had any

59

1   direct contact with him?
2       A.  No.
3       Q.  Do you know that as of 8/9 I guess two months ago he
4   withdrew as an appellate counsel for you in the in re,
5   CertainTeed Fiber Cement Siding litigation?  Did you know that
6   he moved to withdraw as counsel for Amirali Jabrani and Janet
7   Jabrani and Real Homes in the above mentioned appeal?
8       A.  No.
9       Q.  Nobody told you that he withdrew?
10      A.  No.
11      Q.  Did you still think he was your appellate counsel in
12  that case?
13      A.  Once again, I'm relying on Chris Bandas.
14      Q.  You don't know?
15      A.  I don't know.
16      Q.  Okay.  I want to just be clear, when you got the
17  notice in the mail about our class action settlement, I guess
18  first was in Wells Fargo, you called Mr. Bandas, and I don't
19  want to know what you spoke to, you had a long conversation with
20  him?
21      A.  Yes, before I called Chris Bandas, I went on the
22  website and looked at it and read more about it.
23      Q.  And is this again, do you know is it the Wells Fargo
24  website or the settlement website, you're not sure?
25      A.  I went through class action lawsuit site, whatever it

60

1   was, I don't know exactly, and that's what gave the summary and
2   gave all the information.
3       Q.  But you didn't print out the settlement agreement?
4       A.  No.
5       Q.  So you had a call with Mr. Bandas in the first case,
6   and that would be Wells Fargo?
7       A.  Yes.
8       Q.  Now, I just want to know the other stuff, you didn't
9   go and research forced place insurance cases in other
10  settlements?
11      A.  No.
12      Q.  You didn't talk to anyone at the bank or at the
13  insurance company, you said you tried but never got called back?
14      A.  I never got called back.
15      Q.  So you never talked to anybody at the bank or at the
16  insurance company?
17      A.  Only I knew about that I was overcharged was from
18  St. Charles Insurance Company, that is my broker.
19      Q.  Right, but you didn't talk to anybody, you didn't
20  speak to anyone in the industry about lender place charges?
21      A.  No.
22      Q.  You didn't talk to anybody about the injunctive
23  relief, besides your lawyer and if you did or you didn't, I
24  don't want to know?
25      A.  I got little information from St. Charles Insurance

61

1   Company about they're charging extra premium because of the
2   lapse of insurance, even though there was no lapse of insurance.
3       Q.  Right, I just want to know what else you did to
4   research this case.
5       A.  Yes, sir.
6       Q.  Did you do anything else to research this case besides
7   talk to Mr. Bandas and briefly look on the website?
8       A.  I went on the website, yeah.
9       Q.  You went on the website?
10      A.  Several times, yes, not one time but several times.
11      Q.  You talked to Mr. Bandas, did you do anything else?
12      A.  No.
13      Q.  And that was Wells Fargo?
14      A.  Wells Fargo as well.
15      Q.  Then you get the notice afterwards for SunTrust?
16      A.  Yes.
17      Q.  And did you do the same thing, you picked up the
18  phone, you called Mr. Bandas, I don't want to know what you
19  discussed, but you didn't do any other independent research
20  besides talking to Mr. Bandas?
21      A.  Went on the computer.
22      Q.  Looked at the website?
23      A.  Looked at the website and not only once, I must have
24  looked at least 7 or 8 times, both of them.
25      Q.  Okay.  Did you do anything else?

62

1    A.  No.
2    Q.  The notes that we marked as Exhibit 2, when did you
3  prepare those?
4    A.  I got it over period of time reading and writing down
5  everything.
6    Q.  When last week, or two weeks ago?
7    A.  Last two weeks.
8    Q.  Okay.  So Exhibit 2 was prepared by you about a week
9  ago?
10   A.  From Monday on was after talking to --
11   Q.  I don't want to know what you discussed, but Exhibit 2
12  was prepared about a week ago, yes?
13   A.  Two weeks ago.
14   Q.  Two weeks ago.  And it was in preparation -- so you
15  were prepared for today's deposition?
16   A.  Yes.
17   Q.  And everything that you've done in the last week I
18  don't want to know discussions, but everything you did meeting
19  with local counsel, talking with Mr. Bandas, did you talk to
20  him?
21   A.  Yes.
22   Q.  That was all to prepare for today's deposition?
23   A.  Yes.
24   Q.  And is that why you read the settlement agreement is
25  to prepare for today's deposition?

63

1    A.  Yes.
2    Q.  Do you have any opinion on what Mr. Bandas should
3  receive as attorney's fees in this case?
4    A.  No opinion.
5    Q.  You don't take any opinion, you don't know if it's a
6  certain amount, do you have a certain amount in mind?
7    A.  No.
8    Q.  Does it matter what the claims rate is for his
9  attorney's fees?  You had said class counsel shouldn't get a lot
10  because the claims rate is low, if the claims rate is low,
11  should Mr. Bandas not get a fee?
12   A.  Once again, I don't know, I have no opinion on that.
13        MR. MOSKOWITZ:  Okay.  I have no further questions,
14  thank you very much for giving us a deposition.
15        MR. WOODS:  I have no questions, and I haven't talked
16  to you about whether you want to read your deposition transcript
17  or not.
18        (Whereupon deposition concluded at 11:29 p.m.)
19        (Signature not waived)
20
21
22
23
24
25

64

### CERTIFICATE OF REPORTER

I, ANGIE R. KELLY, an Illinois Certified Shorthand

Reporter (IL CSR# 084-004498) and Missouri Certified Court

Reporter (MO CCR# 1010) do hereby certify that the witness

whose testimony appears in the foregoing deposition

transcript was duly sworn by me; that the testimony of said

witness was taken by me to the best of my ability, and

thereafter reduced to typewriting under my direction; that

I am neither counsel for, related to, nor employed by any

of the parties to the action in which this deposition was

taken; and further, that I am not a relative or employee of

any attorney or counsel employed by the parties hereto; nor

financially or otherwise interested in the outcome of this

action.

IN WITNESS WHEREOF, I have hereunto set my hand and

seal this 12th day of November, 2014.

_____

Notary Public