# EXHIBITE

1

1

2

3          UNITED STATES DISTRICT COURT

4          SOUTHERN DISTRICT OF FLORIDA

5          Case No. 0:13-cv-60721-FAM

6

7   IRA MARC FLADELL, SARAH CROUCH,

8   GREG OLSON, MARGARET

9   ZAWISTOWSKI, TILENA ALI, DANNY

10  LANE and BEVERLY LANE on behalf of

11  themselves and all others similarly

12  situated,

13       Plaintiffs,

14  v.

15  WELLS FARGO BANK, N.A., et al,

16       Defendants.

17

18  VIDEOTAPED DEPOSITION OF JANET JABRANI

19       Taken on behalf of the Plaintiffs

20

21          November 10, 2014

22  (Whereupon, the deposition began at 11:31 a.m.)

23

24

25

## Page 2

```
1
2         INDEX OF EXAMINATION
3
4                      Page
5   Questions by Mr. Harke............................ 5
6
7
8
9         INDEX OF EXHIBITS
10
11  Exhibit No. 9       agreement...................... 24
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                    A P P E A R A N C E S
2   For the Plaintiffs:
3       KOZYAK TROPIN & THROCKMORTON, P.A.
4       2525 Ponce De Leon, 9th Floor
5       Coral Gables, Florida 33134
6       Tel: 305-372-1800 / Fax: 305-372-3508
7       By Mr. Adam M. Moskowitz
8         HARKE CLASBY & BUSHMAN, LLP
9         9699 NE SECOND AVENUE
10        MIAMI, FL 33138
11        Phone: 305-536-8220
12      By Lance A. Harke
13  LOCAL COUNSEL:
14        Law Offices of Haar & Woods, LLP
15        1010 Market Street, Suite 1620
16        St. Louis, Missouri 63101
17        (314) 241-2244
18      By Mr. Peter Woods
19  The Court Reporter: Ms. Angie Kelly, CSR/CCR
20        Missouri CCR No. 1010 Illinois CSR No. 084-004498
21        Midwest Litigation Services
22        711 North Eleventh Street
23        St. Louis, Missouri 63101
24        (314) 644-2191
25  The Videographer: Mr. Dave Willman
```

## Page 3

```
1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF FLORIDA
3           Case No. 0:13-cv-60721-FAM
4
5   IRA MARC FLADELL, SARAH CROUCH,
6   GREG OLSON, MARGARET
7   ZAWISTOWSKI, TILENA ALI, DANNY
8   LANE and BEVERLY LANE on behalf of
9   themselves and all others similarly
10  situated,
11          Plaintiffs,
12  v.
13  WELLS FARGO BANK, N.A., et al,
14          Defendants.
15  DEPOSITION OF WITNESS JANET JABRANI
16  produced, sworn, and examined on the 10th day of November,
17  2014, between the hours of 11:31 in the morning and 12:19 in
18  The morning of that day, at the offices of Haar & Woods, LLP,
19  1010 Market Street, Suite 1620, St. Louis, Missouri 63101,
20  Before ANGIE KELLY, a Certified Court Reporter within the
21  United States District Court, Southern District of Florida,
22  Wherein Ira Fladell, et al is the Plaintiff, and Wells Fargo
23  Bank, et al are the Defendants.
24
25
```

## Page 5

```
1       IT IS HEREBY STIPULATED AND AGREED, by and
2   between counsel for the Plaintiffs and counsel for the
3   Defendant, that the deposition of JANET JABRANI
4   may be taken in shorthand by Angie Kelly, a
5   Certified Shorthand Reporter, and afterwards
6   transcribed into typewriting; and the signature of the
7   witness is expressly NOT waived.
8               * * * * *
9           JANET JABRANI,
10  Of lawful age, being produced, sworn and examined on
11  behalf of the Plaintiffs, deposes
12  and says:
13          EXAMINATION
14  QUESTIONS BY MR. HARKE:
15      THE VIDEOGRAPHER:  We are on the record.  Today's date
16  is November 10, 2014 and the time is 11:31 a.m. This is the
17  video recorded deposition of Janet Jabrani in the matter of
18  Fladell verses Wells Fargo Bank.  This deposition is being held
19  at 1010 Market Street, St. Louis, Missouri.
20      Would the attorneys present please introduce
21  themselves.
22      MR. HARKE:  Good morning, this is Lance Harke and Adam
23  Moskowitz on behalf of the plaintiff.
24      MR. WOODS:  Pete Woods is here on behalf of objectors
25  Amirali Jabrani and Janet Jabrani, and again I am here in the
```

**6**

1  capacity as local counsel defending the depositions only, have
2  not entered my appearance in the case and do not plan to do so.
3  Q. (By Mr. HARKE) Mrs. Jabrani, good morning, how are
4  you?
5  A. Fine, thank you.
6  Q. So you were here during the deposition that just
7  concluded of your husband; is that right?
8  A. That is correct.
9  Q. And was there anything that you heard during the
10  course of that deposition that you thought was incorrect or that
11  you wanted to change or modify or supplement in any way?
12  A. Yes, there is.
13  MR. WOODS: Let me object to the extent you're asking
14  her to remember all his testimony and what issues. To the
15  extent that you can remember something off the top of your head,
16  I have no objection to your testifying to that.
17  A. Okay. I don't know if this is material or not, but I
18  did want to say this. You had asked Ali if we had ever been
19  part of a class, class action suit where we didn't object and
20  years ago it was a rental property that we owned that had a
21  problem with vertical siding, and so, I do believe to best of my
22  knowledge that we participated in that class action lawsuit, I
23  think that's it.
24  Q. (By Mr. Harke) Okay.
25  A. The second thing, Ali went on about the claims

**7**

1  process, I don't think he articulated very clearly that and once
2  again, this is information that either he read or had
3  conversation with his attorney or whatever, but there's a time
4  constraint to the class members to file their claims, and I know
5  he said that the claims form itself was confusing to him, I also
6  understand that the class members are going to have to dig
7  through their records to perhaps find what kind of -- what their
8  amount was that they had that forced place insurance, when
9  really SunTrust and Wells Fargo should have that information in
10  their wheelhouse, so to ask the class members for that it can be
11  time constraining and so those class members might get
12  frustrated with the process and not file claims.
13  Q. Was that everything?
14  A. That was on that issue, I just wanted to make sure
15  that that point got brought up to be the fairness of the class
16  members.
17  Q. Sure. You mention the time constraints, do you know
18  what the time period is for the completion of the claims in
19  either the SunTrust settlement or Wells Fargo settlement?
20  A. No, once again I'm kind of at an disadvantage. Ali is
21  the person who really takes care of most of our rental home
22  business.
23  Q. Okay.
24  A. I'm privileged to the information that he has, he
25  discussed it with me. I didn't read over the materials probably

**8**

1  as well as he did, my dad is staying with us so it takes up a
2  lot of my time.
3  Q. Sure.
4  A. But I do remember reading in there that -- I lost my
5  train of thought for a second.
6  Q. I was asking if you knew how long a claimant had to
7  file a claim?
8  A. Yes, had until like January 2015. I think that the
9  claims process is going to be open then, so they don't, they
10  being the attorneys for the class members, don't really know how
11  many class members will file claims.
12  Q. Right.
13  A. Because the way that this settlement is being
14  negotiated.
15  Q. That's true, but that's different from should the
16  claims period be longer, you're not saying it should be three
17  months as opposed to two months or five months as opposed to
18  four months, do you have an opinion on how long a period --
19  A. I don't have an opinion on that.
20  Q. Okay.
21  A. I just know that from the way I understand it to be,
22  that the claims historically that are being filed are a smaller
23  percentage, the class counsel attorneys perhaps have inflated
24  the numbers of claims that they believe will be processed. And
25  another issue that I have --

**9**

1  Q. Before you leave that one, if I may, do you know why
2  you're saying that, what is that based on?
3  A. Once again, I hear information and then I formulate
4  opinions on it, but to say where that information came from I'm
5  not certain.
6  Q. And you just said you rely mostly on your husband to
7  provide --
8  A. Information.
9  Q. Information regarding the rental home businesses?
10  A. Yes, as far as the financing and the insurance and
11  things like that.
12  Q. Okay.
13  A. I'm kind of the silent partner.
14  Q. Silent partner. Would that also be the case for these
15  objections that your husband really handles it, you're there but
16  you rely mostly on him for guidance?
17  A. Exactly, exactly.
18  Q. Do you know whether the properties that were or
19  property that was force placed in either Wells Fargo or SunTrust
20  was a rental home of yours or was it a residential home?
21  A. More than likely, it could be both, but we have quite
22  a few rental properties that are with different mortgage
23  companies, so if there's -- and I don't know how many.
24  Q. Right.
25  A. But we only have one residential home where we have

## 10

1  several rentals, so I would say that it would be 100 percent a
2  rental, you know what I mean, like it could be our home, we have
3  one of them, but perhaps our home is SunTrust and then a couple
4  of the rentals might be SunTrust or Wells Fargo.
5  Q.  Okay.
6  A.  Did that make any sense?
7  Q.  No.  So you have a residential home, right?
8  A.  Uh-huh.
9  Q.  Was any of these force placed either in Wells Fargo
10  was it on your residential home, the home you live in?
11  A.  Boy, I don't know, I just don't know.
12  Q.  You don't know?
13  A.  Huh-uh.
14  Q.  And do you know whether it was on a rental you have,
15  you said you mentioned you have several rental properties too,
16  right?
17  A.  Correct.
18  Q.  And so you think it's most likely on one of those
19  properties, more of those properties that the force placed
20  insurance was placed?
21  A.  I don't know.
22      MS. WOODS:  Objection, misstates her testimony, go
23  ahead if you know.
24  A.  I don't know.  I don't know.
25  Q.  (By Mr. Harke) You don't know one way or the other?

## 11

1  A.  No. But another thing that Ali didn't mention this,
2  from the way I understand it, the class members they were
3  overcharged perhaps 18 percent on that forced place insurance,
4  18 percent more than if they would have gotten a different
5  insurance provider, and that the, or sorry -- I'm so ADHD yeah,
6  if there's a bird that flies by, it will get my attention.
7  Q.  Sorry.
8      MR. WOODS:  So they're distracting you by passing
9  their papers?
10  A.  No, no, but I am always distracted.
11  Q.  (By Mr. Harke) So you get the percentages is too high,
12  is that what you were going to say?
13  A.  No, I'm saying this, the forced place insurance I
14  think the research indicates that it's 18 percent higher than if
15  they would have been able, they the class members, would have
16  been able to go out and procure their own insurance.
17  Q.  In the voluntary market?
18  A.  Exactly, that insurance is 18 percent higher, but the
19  claims process is only going to make those class members give
20  them back 10 percent, so they're going to be 8 percent not
21  whole.
22  Q.  Okay, I see what you're saying.  But it's a
23  settlement, right, and in a settlement you're not going to
24  necessarily, you'd have to win the entire lawsuit to get all of
25  your damages back?

## 12

1  A.  Right.
2      MR. WOODS:  Objection argumentative, subject to that
3  if you understand the question, go ahead and answer.
4  A.  I think that I understand the question.
5  Q.  (By Mr. Harke) Right.
6  A.  It's this, so if the class members attorneys and the
7  class representatives aren't given so much of the pie, then that
8  will leave more to make the class members whole, and I believe
9  Ali touched on it when he said that $19 million was going to be
10  awarded to the class representatives and to the attorneys for
11  their expenses and their fees, and however, the class would only
12  be getting $20 million of that, and anything else from that fund
13  would be reverted back to Wells Fargo.
14  Q.  Okay.
15  A.  So if there was simple reallocation of those funds
16  then everybody in the class could be made whole, all the class
17  members would be made whole.
18  Q.  So we talked about a couple of things in there, let me
19  ask you first about the percentages, you said 18 percent and
20  then 10 percent is what the settlement is, is your understanding
21  is that what you said?
22  A.  Correct.
23  Q.  My question to you is this is a settlement, so in the
24  settlement, you anticipate that you're going to get 100 percent
25  back on the dollar, or would you expect to get back less than

## 13

1  100 cents on the dollar in a settlement?
2  A.  Well, if I would expect it, then I would expect to be
3  made whole.
4  Q.  You'd be made whole, but even in a settlement context,
5  you think you should get every penny back that you lost?
6  A.  I think every class member should get everything back
7  that they lost.
8  Q.  Sure.
9  A.  Because especially with the way the economy is and
10  these people may have even had their homes foreclosed on.
11  Q.  Right.
12  A.  So right now, you know that person whose now hand to
13  mouth could benefit from being whole, so yeah I would like them
14  all to be whole.
15  Q.  But okay, and then you also talked about the amount of
16  money that's in -- do you think that there's a pot of money in
17  this case to be distributed to the class members and the
18  attorneys, is that how you think these settlements work?
19      MR. WOODS:  Wait until he finished his question before
20  you answer.
21  Q.  (By Mr. Harke) In this case, how do you think the
22  settlement works in either Wells Fargo or SunTrust, I heard you
23  talk about attorney's fees plus money to go to the class, do you
24  think this there's a pot of money, a common fund from which
25  these payments are going to be made?

## 14

1    A.  Yes, I do.
2    Q.  Okay.
3    A.  I had to think about that for a while.
4    Q.  Sure.
5    A.  But I think in what I read, I think yes.
6    Q.  So you think from that pot of money, some of the money
7  that's going to the attorneys should go back into the pot and
8  some of that should go back to the class members, is that the
9  essence of one of your objections in these cases?
10    A.  Yes, that's the essence of one of my objections
11  because from the way I understand it, that Wells Fargo and
12  defendants, the attorneys have already kind of negotiated this,
13  so there's no one, as in the attorneys for the class action and
14  Wells Fargo looking out for the common interest of all the class
15  members, because it's that common fund, and anything left over
16  from that common fund instead of making all the class members
17  whole, it will go back to Wells Fargo.
18    Q.  What about the judge, do you think the judge is
19  overseeing the class action and the settlement process for the
20  benefit of the class members too?
21    A.  Say that again?
22    Q.  I'm asking you whether you think the judge who's in
23  charge of these two cases, do you also think the judge is
24  responsible to oversee the fairness and reasonableness of the
25  settlement in addition to what objections you can bring?

## 15

1    A.  Well, the court will have to actually make it fair,
2  because the judge doesn't have as much support so the court
3  would have to.
4    Q.  Do you know that the court in both Wells Fargo and
5  SunTrust overruled you and your husband's objections and said
6  there was no merit to them, were you aware of do that?
7    A.  I don't think so.
8    Q.  Okay.  Let me ask you this, let me show you what I'll
9  mark as a composite Exhibit 1 to this deposition, better make it
10  9, keep the numbers the same.
11    MR. WOODS:  Would you identify the document?
12    MR. HARKE:  Yes, these are the claims.  All right.
13  Let me take that back.  Let me just ask you a question about --
14    MR. WOODS:  Would you identify the documents?
15    MR. HARKE:  Well, I'm not going to ask her about the
16  document.
17    MR. WOODS:  Well, just for my edification, I don't
18  know.
19    MR. HARKE:  I'm conducting the deposition, I'm about
20  to do it, I'm using this as a basis for the question.
21    Q.  (By Mr. Harke) Do you, let me go back to you now, do
22  you reside at 2038 Moondance Court?
23    A.  Yes, I do.
24    Q.  O'Fallon, Missouri, 63368-6884?
25    A.  I never put the 6884 on the bottom.

## 16

1    Q.  Understood, and that's your home residence?
2    A.  Yes, it is.  And if you're questioning, I'm just going
3  to throw that out there --
4    MR. WOODS:  Just answer the questions.
5    A.  But I think I know what he's getting at.
6    MR. WOODS:  I don't care.
7    Q.  (By Mr. Harke) You can tell me, if there's something
8  you want to say, you can say it, obviously --
9    MR. WOODS:  Your attorney is instructing you to answer
10  the questions only.
11    A.  Yes, that's where I live.
12    Q.  (By Mr. Harke) That's where you live, very good.  Have
13  you ever filed an objection before besides the two that you
14  filed in these cases?
15    A.  Yes.
16    Q.  Okay.  And what case was that?
17    A.  It was CertainTeed.
18    Q.  What was the basis for your objection there, do you
19  know?
20    A.  Yes.
21    Q.  What was it?
22    A.  Sorry?
23    Q.  That's okay.
24    A.  Kind of the same situation that we have here, we
25  wanted everyone in the class to be made as whole as could be.

## 17

1    Q.  Okay.  And I understand from your husband in his
2  deposition that that objection was the subject of a confidential
3  settlement; is that right?
4    A.  Yes.
5    Q.  All right.  Do you know whether or not the terms of
6  the relief to the class in the CertainTeed case changed in any
7  way as a result of your objection?
8    A.  I think I know the answer to that, can I answer it?
9    MR. WOODS:  Sure.
10    A.  Yes.
11    Q.  (By Mr. Harke) What changes were made?
12    A.  I don't know the minutia.
13    Q.  You don't know the minutia.  So you think as a result
14  of your objection, CertainTeed that the class benefitted and
15  received something additional that it wouldn't have received but
16  for your objection; is that fair?
17    A.  Yes, I do, that's very fair, thank you.
18    Q.  And you've talked about the files in the claims forms
19  in Wells Fargo and in SunTrust, right?
20    A.  Correct.
21    Q.  And you said you thought there need to be some
22  information that the class members had to provide on the form
23  that you thought was unfair?
24    A.  Not necessarily on the form.
25    Q.  Okay.

18

1    A.  But I do want to say this too, I know that in the
2  state of Missouri, that any kind of information that goes out
3  from the state, say if you're on Medicaid or anything like that,
4  any kind of information that's sent to the population in this
5  state of Missouri has to be written at a 5th grade reading
6  level, and I really wasn't wholeheartedly privy to that claims
7  form like I didn't absorb it, but I think that the reading level
8  there was probably high, so once again, I'd like to just kind of
9  state that I think that claim form could be confusing, as it was
10  to us, number one, and then yes, I'm not sure where I heard
11  that, but I thought that the class members were actually going
12  to have to gather their own documentation to proceed farther
13  with the claims.
14    Q.  Okay.  Do you know what specific documentation you
15  think the class members needed to gather to fill out the claims
16  form?
17    A.  No, I don't know specific information, but I would
18  think that SunTrust and Wells Fargo would have that in their
19  wheelhouse because they're the ones who cooperated with the
20  insurance companies to put that forced place insurance on those
21  individuals.
22    Q.  But you didn't fill out either one of the claims forms
23  yourself, did you let me just finish, for SunTrust or Wells
24  Fargo; is that right?
25    A.  No, I did not fill that out myself.

19

1    Q.  Your husband did?
2    A.  Yes, he did.
3    Q.  Did you look at the forms?
4    A.  Briefly, and I couldn't even tell you how many boxes
5  you needed to check.
6    Q.  So but you're not positive as you sit here today what
7  information the claimants need to gather to submit these claim
8  forms; is that fair?
9    A.  That's fair.
10    Q.  All right.  And so you don't know which information is
11  needed either for SunTrust or Wells Fargo, right?
12    A.  Correct.
13    Q.  Did you -- do you know when you first became aware of
14  the settlements in either Wells Fargo or SunTrust?
15    A.  It must have been in July or June when Ali told me
16  that he had gotten that information and asked me to sign the
17  claim form.
18    Q.  Okay.  And then after you signed the claims form, how
19  did you wind up retaining Mr. Bandas?
20    A.  Ali worked with Mr. Bandas and so then, he came to me
21  and said that he read that settlement and that he thought that
22  it really wasn't fair and adequate and reasonable for all class
23  members, and you know, he thought he would seek advice from the
24  general counselor, Chris Bandas from there.
25    Q.  And Chris Bandas was the person who had represented

20

1  you in the CertainTeed case as an objector, right?
2    A.  Yes.
3    Q.  Have you ever had any other legal work done by
4  Mr. Bandas besides the three matters that we're talking about
5  here that I just mentioned?
6    A.  That was correct, no.
7    Q.  And do you know that Mr. Bandas serves as a lawyer who
8  his job is to file objections for clients?
9    A.  Yes, I was made aware of that.
10    Q.  All right.  How were you made aware of that?
11    A.  When I had the deposition with the CertainTeed case.
12    Q.  Uh-huh.  When you've got other class action notices in
13  the mail, do you always call Mr. Bandas or does your husband
14  call Mr. Bandas to discuss them?
15    A.  No, no.
16    Q.  What was it about this one that led your husband to
17  contact Mr. Bandas?
18    A.  I don't know.
19    Q.  You're not sure.  Have you ever had any other
20  litigation lawsuits, besides these three matters, CertainTeed,
21  Wells Fargo and SunTrust?
22    A.  No, sir.
23    Q.  Have you ever been the subject of any civil penalties
24  or civil investigations, you or your husband?
25    A.  No.

21

1    Q.  Are you familiar with the lawsuit state of Missouri
2  versus Amilari Jabari pending in St. Louis County, Circuit
3  Court?
4    A.  Oh, is this pending in St. Louis Circuit Court?
5    Q.  It was at one time.  Are you familiar at all with that
6  lawsuit?
7    A.  I am, I think, and I'll tell you why, because every
8  now and then, Ali will go out to Missouri Case.net and he'll
9  just Google our names and just the other day he did that, and
10  something came up and it was our old address 4068 Bugle Bend
11  Drive, Florissant, Missouri that came up.  So he thought, oh,
12  wow I wonder what this is about.  So he called the attorney or
13  whomever and asked about it, and it was an error, it was
14  something else and they just put his name at our old address.
15    Q.  Okay.
16    A.  If that's what that was?
17    Q.  Well, did you and your husband ever own a gas station
18  in the state of Missouri?
19    A.  Yes, we did.
20    Q.  And at one time, did that gas station sell antifreeze
21  that was mismarked or worthless or otherwise not of adequate
22  value -- because the court reporter is taking everything down, I
23  have to wait for you to finish your responses and I also have to
24  finish my question, otherwise the court reporter will get it all
25  confused.  So are you familiar with a lawsuit over those

---

**22**

1  allegations that your gas station was selling worthless
2  antifreeze?
3      A.  Are you asking me if I knew about the lawsuit around
4  it?
5      Q.  Yes, ma'am.
6      A.  No, I did not know about the lawsuit about it, but I
7  did hear about that incident, and that was years ago, and that
8  wasn't -- oh, I put my hand over my microphone, that wasn't us,
9  I mean, I don't know how to say this, we weren't at fault, we
10  were the proprietors at that gas station and the supplier of the
11  antifreeze was the person who was bastardizing or buying
12  bastardized product, and we, sold it to us, and then we in turn
13  sold it to customers.
14      Q.  And that's all you know about it?
15      A.  That's all I know.
16      Q.  Have you ever been contacted by the state of Missouri
17  in connection with this lawsuit?
18      A.  No, sir.
19      Q.  They've never asked you any questions or contacted you
20  or your husband on the phone to discuss it as far as you know?
21      A.  No, sir.
22      Q.  Okay.  Let me go back to the hiring of Mr. Bandas, so
23  your husband got the notices, and completed the claim form; is
24  that right?
25      A.  Yes.

---

**23**

1      Q.  And then you said he spoke to you, he thought, your
2  husband thought that there was something that he felt was unfair
3  about the settlements and he contacted Mr. Bandas; is that
4  right?
5      A.  Yes.
6      Q.  And then you wound up signing a retainer agreement
7  with Mr. Bandas; is that correct?
8      A.  Yes.
9      Q.  Okay.  So let me show you this has been marked part of
10  Plaintiff's Exhibit 1, we only have the one for SunTrust, let me
11  show you this document and ask you if this is your signature
12  down here?
13      A.  Nope, that's not me.
14      Q.  That's your husband's signature, right?
15      A.  Uh-huh.
16      Q.  And you didn't sign this agreement?
17      A.  Is there a separate agreement?  There probably is a
18  separate one other than this one, there has to be one with my
19  name on it.
20      Q.  Okay.  You think there's a separate one for you too?
21      A.  I would say yes.
22      MR. WOODS:  If you know.
23      Q.  (By Mr. Harke)  I don't know for certain, but I would say yes.
24      A.  I don't know for certain, but I would say yes.
25      MR. HARKE:  So this is a different set of the three,

---

**24**

1  but for her?
2      MR. WOODS:  Yeah, my bad.
3      MR. HARKE:  We're still missing Wells Fargo.
4      MR. WOODS:  Yeah, we're still missing Wells Fargo, but
5  that's SunTrust just for the record, it's an agreement for Mrs.
6  Jabrani relative to SunTrust, and again, that's separate from
7  Mr. Jabrani.
8      MR. HARKE:  Yeah, this is for SunTrust, so.
9      MR. WOODS:  We have no Wells Fargo agreements.
10      MR. HARKE:  Right.
11      MR. WOODS:  But it's my understand they were signed
12  for that as well, you just don't have them in this office.
13      MR. HARKE:  Okay, so let's make this one Exhibit 9?
14      MR. WOODS:  10?
15      MR. HARKE:  Or, I think it's.
16      MR. WOODS:  You never formally introduced 9.  This is
17  9 now?
18      Q.  (By Mr. Harke) This is what we marked as Plaintiff's
19  Exhibit 9 and if you tell me what this is, first of all?
20      A.  This is the class action objector power of attorney
21  and contingent fee agreement.
22      Q.  Okay.
23      A.  And that's agreements made between me and the office
24  of, law office of Bandas Law Firm.
25      Q.  Okay.  And if you go to the last page, Mrs. Jabrani.

---

**25**

1      A.  Uh-huh.
2      Q.  You see it says signed and accepted this 26 day of
3  July, 2014 you see that?
4      A.  Yes.
5      Q.  And that's your signature above your name, Janet
6  Jabrani; is that right?
7      A.  Uh-huh, and that's my writing there.
8      Q.  That is your writing, all right.  So this is for the
9  SunTrust objection, and your counsel has told us that there's
10  another one that you signed for Wells Fargo; is that right?
11      A.  I feel pretty confident that that's correct.
12      Q.  Do you know if they were signed around the same time?
13      A.  I would say yes.
14      Q.  Okay.  So that would be July 26, 2014?
15      A.  Yes.
16      Q.  And at the time that you signed this document and the
17  one for Wells Fargo, tell me everything you had personally
18  looked at in connection with the Wells Fargo and SunTrust
19  settlements?
20      A.  Nothing.
21      Q.  Okay.  And so you had not seen the settlement
22  agreement, correct?
23      A.  Correct.
24      Q.  You had not seen the preliminary approval order; is
25  that correct?

---

8 (Pages 26 to 29)

26

1    A.   Correct.
2    Q.   As you sit here today, you've seen the settlement
3  agreement?
4    A.   Yes.
5    Q.   Did you review it in detail?
6    A.   I reviewed it in as much detail as I could, like I
7  said, I'm kind of a little bit stressed out with my dad being at
8  home.
9    Q.   Yeah.
10   A.   But I read it as good and understood it as well as I
11  could.
12   Q.   Sure.  And that was very recently right though, right?
13   A.   Yes.
14   Q.   And that was in connection with getting ready for this
15  deposition here today; is that right?
16   A.   And also understanding, I wanted to make sure that I
17  was aware of all the ins and outs, because I don't want to be
18  ignorant.
19   Q.   Sure.  And you knew I'd be here asking you questions,
20  right?
21   A.   Sure.
22   Q.   Okay.  Did you review the objection of Mr. Bandas
23  filed on your behalf?
24       MR. WOODS:  I'll object, I don't think Mr. Bandas
25  technically filed it, I don't think his name was on the

27

1  pleading, so to the extent that you want to put a pleading in
2  front of her that has Mr. Bandas name on it, that's fine,
3  otherwise I think the question is misleading and I object on
4  that basis.  But subject to that, if you know, go ahead and
5  answer.
6    A.   I don't really understand what your question is.
7    Q.   (By Mr. Harke)  Okay.  Did you review the objection
8  that was filed on your behalf before it was file?
9    A.   Like do I know what my objections are?
10   Q.   No, the actual objections, the actual physical
11  document?
12   A.   I don't know, I don't know.
13   Q.   You don't know whether you did or not.  Okay, let me
14  show you this one, this is Exhibit 6 from the prior deposition
15  of your husband, do you know what document this is?
16   A.   And what's your question again?
17   Q.   My question is, whether you reviewed this document
18  before it was filed on your behalf, beforehand?
19   A.   No.
20   Q.   Okay.  So this is the one for Wells Fargo.  And let me
21  show you Exhibit 7 this is your objection and SunTrust, and I'm
22  going to ask you the same question, did you review this
23  document, this objection before it was filed on your behalf?
24   A.   I'm going to say no.
25   Q.   Okay.  You had testified earlier you were not aware

28

1  that the court in both Wells Fargo and SunTrust overruled your
2  objection and said that your objections had no merit, is that
3  right, you weren't aware of that, were you?
4    A.   Before today?
5    Q.   Yes.
6    A.   Correct.
7    Q.   Okay.  And so, did you have any knowledge that an
8  appeal of the court's order was taken of your objection?
9    A.   Say that again.
10   Q.   After the court overruled your objections and said
11  that they had no merit, do you know -- did you know that an
12  appeal was taken of that order on your behalf?
13       MR. WOODS:  I'll object to the extent that you're
14  presenting facts which are not of record in front of her, and
15  therefore she has no ability to evaluate the merit of what your
16  statement is, whether it's true or false and therefore the
17  premise of the question is inappropriate.  Subject to that, if
18  you've reviewed a document that says what counsel has just
19  stated to be the case, you can answer the question.  Otherwise,
20  don't.
21   A.   I haven't reviewed a document.
22   Q.   (By Mr. Harke)  You've never seen a notice of appeal
23  taken of your objection in either Wells Fargo or SunTrust?
24       MR. WOODS:  Well, again I'll object, I don't think
25  that was your initial question.  To the extent that's the

29

1  question now you can answer that question.
2    A.   But I don't understand, like what are you asking me if
3  I've seen a particular document?
4    Q.   (By Mr. Harke)  Yes, ma'am.
5    A.   Before it was filed?
6    Q.   No, just at any time.
7    A.   Can you show me that document so I can look at it?
8    Q.   Well, after the court overruled your objections, I'm
9  asking you whether you were aware that a notice of appeal was
10  taken of the court's order that overruled your objection?
11       MR. WOODS:  I'll object as vague and ambiguous, it's
12  not clear which lawsuit is being referenced or which document.
13  To the extent that you know, go ahead and answer.
14   A.   I don't know.
15   Q.   (By Mr. Harke)  I mean you were not aware that your
16  objections were overruled were you, in SunTrust and Wells Fargo?
17       MR. WOODS:  Same objection, I object it's vague and
18  ambiguous because it doesn't reference the case and certainly
19  doesn't reference a document, but subject to that, if you know
20  what he's talking about, go ahead and answer.
21   A.   I don't know really know what you're talking about,
22  but maybe if you can kind of tell me what you're getting at,
23  then I'll be able to answer you.
24   Q.   (By Mr. Harke)  Well, we're here on Wells Fargo and
25  SunTrust.

Veritext Florida Reporting Co.

---

**30**

1    A.  I understand that.
2    Q.  So those are the only two cases --
3    A.  And I understand.
4    Q.  Those are the only two cases we are here to talk
5  about, let me ask you this.
6    A.  Okay.
7    Q.  You did not know that an appeal was taken of your
8  objections, did you?
9    A.  Was it something that I signed?
10    Q.  It's a notice of appeal.
11    A.  I'll just have to say I don't know.
12    Q.  Okay.
13    A.  Because I don't want to say I did, if I didn't, like I
14  don't know, so I'm going to say I don't know, sorry.
15    Q.  Okay.  What other issues do you have with the
16  settlements in Wells Fargo and SunTrust other than you talked
17  about the claims form?
18    A.  The claims form and that injunctive agreement too.
19  Once again, that really doesn't help the class members that are
20  in this class action, because it's something that's going to
21  help in the future, and since these class members have already
22  been affected by this inflated insurance premium already, it
23  won't help them.
24    Q.  Okay.
25    A.  So it's you know, an injunctive order could be good,

---

**31**

1  but I don't feel that it's going to benefit these class members
2  any and then plus, Wells Fargo and SunTrust, they won't make the
3  same, if we want to call it, mistake twice because they know
4  that they'll be in trouble for it.
5    Q.  So but all injunctive relief is for the future?
6    A.  Right, exactly, so it won't help these class members.
7    Q.  But it will help other homeowners, don't you think?
8    A.  I don't think so, because I don't think that any
9  mortgage companies will make the same error as having the forced
10  placed insurance on the group of people so, you know.
11    Q.  Why because they'll get sued again?
12    A.  Yeah, and best practices show that that probably
13  wasn't the way that they should go, so yes, that's what I am
14  saying.
15    Q.  Do you know anything about the forced place insurance
16  process?
17    A.  No, I know very limited only from what I've heard Ali
18  explain to me.
19    Q.  And did you conduct any investigation on your own
20  before agreeing to file objections in SunTrust and Wells Fargo?
21    A.  I did not know, I didn't do any kind of investigating,
22  but I do feel pretty confident that the attorneys who are
23  representing us probably have done a lot of research and
24  investigating and I feel that they probably have good facts and
25  figures on that.

---

**32**

1    Q.  Okay.  And under the terms of the fee agreement that
2  you have with Mr. Bandas, it says here you may get an incentive
3  award of up to $5,000, paragraph 3.2, do you see that?  Is that
4  a yes?
5    A.  I see it, yes, I see it.
6    Q.  Okay.
7    A.  And once again, I signed these kind of documents and
8  read them very quickly, and I did not know that was even in
9  there.
10    Q.  Did not know it was in there, okay.
11    A.  Right, I didn't know it was in there.
12    Q.  All right.
13    A.  Because as I stated, I'm trying to look out for
14  everybody here, and I'd like to see all of the class members be
15  made as whole as possible, so yeah.
16    Q.  And is that what happened in CertainTeed to your
17  knowledge, as a result of your objection the class members were
18  benefitted as a whole?
19    A.  The class members were benefitted as a whole, yes.
20    Q.  By virtue of you bringing your objection?
21    A.  Yes.
22    Q.  And also the next paragraph 3.3 says that Mr. Bandas
23  will receive attorney's fees if he's successful on the appeal,
24  on the objection, were you aware of that?
25      MR. WOODS:  I'll object to the paraphrasing the

---

**33**

1  document, I think the document speaks for itself, but if you
2  understand it as he just described it, you can say, you can
3  testify, otherwise you might want to read it back.
4    A.  Would you like to ask me that again, please?
5    Q.  (By Mr. Harke) Not really, how do you understand
6  Mr. Bandas to be paid in representing you?
7      MR. WOODS:  I'm going to object, document speaks for
8  itself.  To the extent that you have some understanding, go
9  ahead and answer.
10    A.  I don't have any understanding.
11    Q.  (By Mr. Harke) You don't have any knowledge of how Mr.
12  Bandas is to be paid by doing work on your behalf?  And have you
13  ever reviewed the attorney fee provision that you signed in your
14  retainer agreement with Mr. Bandas?
15      MR. WOODS:  Excuse me, I'm going to interrupt, can I
16  get a copy of that, I gave you three, can I get one back so I
17  can be on the same page as you are?
18      MR. HARKE:  I think that's the original one.
19      MR. WOODS:  I just gave you three.
20      MR. HARKE:  Oh here, take this one.
21      MR. WOODS:  Thank you.  Thank you.
22    Q.  (By Mr. Harke) Before your lawyer asked for a copy, I
23  asked you whether or not you had ever seen attorney's fees
24  provision in this agreement, had you?
25    A.  No.

---

34

1  Q. Do you know what it says before now?
2  A. No.
3  Q. Do you know what it says now?
4  A. No, I only heard or remembered a little bit when you
5  were discussing with Ali, but I don't know what it says.
6  Q. Okay. Do you want to take a moment to familiarize
7  yourself with it, or you're comfortable that you signed an
8  agreement that's fair with Mr. Bandas?
9  A. What was this question again?
10  Q. Do you think your agreement with Mr. Bandas was a fair
11  one with respect to how he's to be compensated?
12  A. I would have to say yes, because I rely upon Ali to do
13  those kinds of tasks.
14  Q. Okay. Do you have an opinion as to how much
15  Mr. Bandas should receive in attorney's fees for representing
16  you?
17  A. No, I do not have an opinion.
18  Q. Do you know whether it should be more than the $5,000
19  that you could receive as an incentive award?
20  A. I don't have an opinion.
21  Q. This agreement also says in paragraph 4, that as a
22  result of your objection, the settlement could be disapproved by
23  the court and rejected by the court, do you understand that?
24  A. Yes.
25  Q. What would happen to the class if that were the case?

35

1  A. I don't know what would happen to them. I would like
2  to think though, I would like to think that if this class action
3  is rejected by the court, that it is picked up again and
4  reworked and become more fair for all the class members, and not
5  benefit the claim, the representatives in this, the claim
6  representatives or any of the attorneys. My hope is if this is
7  rejected that it goes back and that it's reallocated, the funds
8  are, and the class members are made whole not only, you know,
9  like in that 8 percent.
10  Q. Sure. But you don't know whether or not that will
11  ever happen, do you?
12  A. No, I do not.
13  Q. Did the court overrule your objection in the
14  CertainTeed case, do you know?
15  A. I do not know.
16  Q. And did the parties go back to the settlement table in
17  the CertainTeed, do you know?
18  A. I don't know.
19  Q. You don't know. I had already asked you and you
20  testified that you were not aware that the court had overruled
21  your objections in both Wells Fargo and SunTrust; is that right?
22  A. Would you ask me that again?
23  Q. You were not aware that the court said your objections
24  had no merit and were overruled in both Wells Fargo and
25  SunTrust?

36

1  A. And I said I didn't answer.
2  Q. No, you said you didn't know that?
3  A. Oh, I didn't know that.
4  Q. Have you ever seen the orders that the court entered
5  on your objections?
6  A. For SunTrust and Wells Fargo?
7  Q. Yes, ma'am.
8  A. Show it to me, and I'll tell you if I saw it.
9  Q. Okay. This is Exhibit 3, which is the order granting
10  final approval in SunTrust.
11  A. So you're asking me when I saw this or if I saw it,
12  because I don't remember ever seeing this.
13  Q. Yeah, I'm just confirming you've never seen it before?
14  A. Okay.
15  Q. Okay. You've never seen it, right?
16  A. No, not that I'm aware of.
17  Q. You've never seen the order that was entered on your
18  objections on Wells Fargo, right?
19  A. Not that I'm aware of, as I said, I depend on Ali and
20  Chris Bandas to kind of keep me up to speed on things, so if I
21  don't see anything, it's really not out of the norm.
22  Q. Okay.
23  A. I work outside of the home too.
24  Q. Very good. Let's take a two minute break.
25  A. Sure.

37

1  (Whereupon, off the record)
2  (Back on the record)
3  MR. HARKE: Okay. Thank you Miss Jabrani, I have no
4  further questions.
5  THE WITNESS: Thank you very much.
6  (Whereupon, the deposition concluded at 12:20 p.m.)
7  (Signature not waived)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38

CERTIFICATE OF REPORTER

1    

2   I, ANGIE R. KELLY, an Illinois Certified Shorthand

3   Reporter (IL CSR# 084-004498) and Missouri Certified Court

4   Reporter (MO CCR# 1010) do hereby certify that the witness

5   whose testimony appears in the foregoing deposition

6   transcript was duly sworn by me; that the testimony of said

7   witness was taken by me to the best of my ability, and

8   thereafter reduced to typewriting under my direction; that

9   I am neither counsel for, related to, nor employed by any

10  of the parties to the action in which this deposition was

11  taken; and further, that I am not a relative or employee of

12  any attorney or counsel employed by the parties hereto; nor

13  financially or otherwise interested in the outcome of this

14  action.

15  IN WITNESS WHEREOF, I have hereunto set my hand and

16  seal this 12th day of November, 2014.

20  _____

21  Notary Public